[Crim. No. 15651.  Second Dist., Div. Five.  Dec. 30, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
PEARL CHOATE BIRCH, Defendant and Appellant.

**COUNSEL**

Bernard A. Leckie for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ivan Hoffman, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**FRAMPTON, J. pro tem.***—

*Statement of the Case*

Defendant was charged by amended information with the crime of assault with a deadly weapon with intent to commit murder in two counts. Count I charged an assault against the person of Rex Council. Count II charged an assault upon the person of Rod[erick] Ferguson. It was further alleged that the defendant had suffered a prior conviction of murder in the State of Texas in 1949. Upon arraignment the defendant entered a plea of not guilty and admitted the truth of the allegation of prior conviction. Upon

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

trial by jury the defendant was found guilty of assault with a deadly weapon upon both counts, a lesser but necessarily included offense within those charged, and not guilty of assault with intent to commit murder. A probation officer's report was ordered. On the day set for hearing the matter of probation, the motion for a new trial was denied and the matter was referred to the Director of Corrections for review regarding placement for diagnosis and treatment pursuant to section 1203.03, Penal Code. Upon return and report from the Director of Corrections, probation was denied and the defendant was sentenced to state prison on both counts, the sentences to run concurrently. The appeal is from the judgment.

On July 13, 1967, Paul R. Herpin, a police officer for the City of Compton, was on patrol duty in a police car when he received a radio message at about 6:42 p.m. to go to 718 East Cypress in the City of Compton. Upon arrival at the location he contacted and spoke with the defendant who then occupied the premises. She advised him that she was the owner of the property, and that she was having trouble with her tenants, Mr. and Mrs. Harris, who did not pay the rent. She had contacted her attorney, and, as a result, she had removed the doors from the unit at 716 East Cypress, the Harris' apartment. Officer Herpin met the defendant's nephew, James Choate. At this time no one else was in the front of 716 East Cypress. The defendant was holding some live ammunition in her hands during this conversation. About 25 minutes later Officer Herpin left.

At about 8 p.m. on July 13, Officer Herpin received a second call by radio to proceed to the same location. Officer Rex Council, who had received a similar radio message arrived at the scene at the same time that Officer Herpin arrived. Both were dressed in police uniforms and were driving conventionally marked black and white police vehicles. Officer Herpin, in the second radio message, was told to contact the person at 716 East Cypress. Upon arrival Mr. Roderick Ferguson spoke with them for about 5 minutes. Mrs. Ferguson and Mrs. Zenobia Huff, Mr. Ferguson's mother-in-law, joined in the conversation. The officers then went to the front door of the back unit, 718 East Cypress. Mr. Ferguson remained outside unit 716, on the driveway and sidewalk which connected with the unit at 718. Mrs. Huff went inside unit 716.

When the officers went to unit 718, they spoke to the defendant, who was standing in her doorway at that address. The front door was partly open.

On this walkway from the sidewalk to the rear unit at 718 there is a tree with low hanging branches under which a person may not walk without stooping.

Mr. Ferguson had never seen the defendant before this date.

When the officers were speaking to the defendant, Mr. and Mrs. Huff were standing on Mrs. Harris' front porch at unit 716, and Mrs. Ferguson was standing on the defendant's front porch with the officers. Mr. Ferguson heard the defendant say to the officers, "to get all the people off of her property" and that "if he didn't get them off her property, she would kill them all."

There was further conversation between the officers and the defendant. During this time Officer Herpin was standing nearest the door at 718, while Officer Council stood on the porch near the house number "718."

Officer Herpin advised the defendant that the relatives of her tenants, the Harrises, had called the police and had inquired as to why the doors were off of the apartment. He told her that a statement had been made to him questioning whether the defendant was the legal owner of the property. Defendant stated that she was the owner, and that even though she was in arrears in payments, she had four months to make up the past due amounts. Mrs. Ferguson told the defendant that Mrs. Harris, the tenant, had a notarized letter from an attorney telling Mrs. Harris not to pay defendant but to make the payments to the attorney. The defendant again stated that she owned the property, and then told Officer Herpin that an unidentified male adult Negro had threatened her.

The defendant was talking loud and was becoming more excited. She said, "They threatened to hurt me" and she wanted the people off of her property. When it was explained by Officer Herpin that Mrs. Huff, who was standing on the porch at 716, was the mother of one of the parties who lived there, and that Mrs. Ferguson, who was standing on the porch of 718 with the officers, was the sister of the woman who lived at 716, the defendant said "Get them all off my property or I'll kill them." Mr. Huff then walked from the sidewalk onto the porch at 718, and the defendant said, "That's him, that's him. That's one of the guys. He's going to kill me. He has a gun in his pocket."

At this point, Officer Herpin turned to Mr. Huff and noticed an obvious bulge in his right front pocket, a square type of bulge. He asked Mr. Huff if he would empty his right front pocket, which he did. It was disclosed that the pocket contained a wallet and a set of keys. Mr. Huff accused the defendant of having threatened him, and the defendant accused Mr. Huff of having threatened her. Mr. Huff then went and stood on the front porch of 716.

The defendant again yelled that she "wanted them all off her property or she would kill them." Mr. Ferguson then walked up and the defendant said, "There's another one there. That's another one. He wants to kill me." She also stated that Mr. Ferguson had a gun. Officer Herpin told the

defendant that Mr. Ferguson did not have a gun. It was obvious that Mr. Ferguson could not have a gun concealed on his person as he was wearing a pair of tight bermuda shorts and a skin-tight T-shirt.

The defendant continued to yell quite loudly "get them all off [my] property or [I] would kill them."

Officer Herpin told the Fergusons and the Huffs to go inside their apartment and he would try and settle the matter. As he looked in the direction of the latter to see if they were moving away, Officer Herpin heard a report that sounded like a gunshot. His back was to the defendant at this instant. He turned to look in the direction of the defendant, and did not see her standing in the doorway. He took a step forward and looked inside the apartment, and "observed her with a rifle in her hand with the weapon aimed in my direction, . . . yelling, 'I'll kill them all, I'll kill them all.'" At this point the defendant was holding the stock of the rifle in her left hand at about hip level and was moving the bolt action with her right hand. She was standing about three feet away from the window inside the apartment. Also, inside the apartment was a white male juvenile and the defendant's nephew.

Prior to the shot, Mr. Ferguson had turned and was walking down the sidewalk. He heard a shot and felt something brush the top of his head. He described the incident as "like a firecracker goes off real close to you." He was not injured. Immediately prior to the shot, he had ducked his head to avoid striking it against the low hanging tree limb. The leaves of the tree just above his head shattered and dropped to the ground. He then turned toward the unit at 718, and saw one of the officers pull out his gun and tell the defendant "that would be enough of that."

Officer Herpin told the defendant to put the rifle down, and she kept repeating, in a loud voice, that "she'd kill them all." Officer Herpin then drew his weapon and ordered the defendant to put the rifle down, since it was aimed in his direction. He told her three times to put the rifle down, and said that if she did not lower the rifle or quit pointing it in his direction, she could possibly be shot. The defendant then lowered the rifle, and Officer Council grabbed it by the barrel and took it away from her. He then gave the gun to Officer Herpin, who took a spent cartridge from the chamber. The weapon was a single shot .22 caliber rifle. The defendant continued to say, "Get them off my property. I'll kill them all. I'll kill them all. They want to kill me. Get them off my property. I'll kill them all."

Officer Herpin arrested the defendant and advised her of her constitutional rights. She stated that she understood such rights. She asked for and was granted permission to call her attorney. She placed such a call.

Officer Herpin examined the window in defendant's apartment and found a bullet hole through it. There were drapes on the window, but they were drawn away from the window and held back by a mattress. From the portion of the window so exposed, the sidewalk leading to the apartment may be seen. The bullet hole in the window was about five feet, nine inches off the ground, and a bullet fired through this hole would strike a person in the chest area. A bullet hole was found in a window of an apartment building directly across the street. A bullet was recovered from the wall opposite this window. This hole lined up with the trajectory of a bullet that could have been fired through the hole made in the window of the defendant's apartment.

On the way to the police station, the defendant, without solicitation, and after being advised of her constitutional rights, told Officer Herpin that she and her nephew had arrived in Compton on that date from Arizona; she was in arrears on payments on her property, but was still the legal owner as she had four months to bring the payments current. She stated that her tenants had not been paying her the rent, and that she had paid for the electricity and water, and had caused the water and lights to be shut off on this date. She stated further that she tried to shoot the victim (Roderick Ferguson) because "I knew that he had a gun and I wanted that nigger off my property. I'm tired of them living off me, and if they ever bother me again, I'll kill them all." When asked by Officer Herpin why she aimed the rifle at him, and whether she had any intention of harming him, she stated that she was attempting to reload the rifle, and that if she could have "I would shoot anyone that wouldn't get off my property. . . . They are all trying to kill me to get my money."

Officer Herpin recalled seeing some live rounds of ammunition in the area of the window.

Rex R. Council, a police officer for the City of Compton, testified that he was standing on the porch area of 718 East Cypress, between the window and front door. He heard the gunshot, and afterwards observed the bullet hole in the window. His position while standing on the porch was from one to six inches to the left of the bullet hole. From such position, the bullet would have passed behind him about breast high. After the shot he moved to a point where he could see inside the apartment. At this time he observed the defendant four or five feet inside the apartment with the rifle in her hand. She was attempting to open the bolt of the weapon, but was having some difficulty. He grabbed the rifle and disarmed the defendant.

Robert P. Christenson, a qualified ballistics expert, testified that, after many attempts, he was unable to cause the rifle to discharge accidentally.

## *Defense*

It would serve no useful purpose here to summarize the testimony of the witnesses for the defense. Briefly this testimony indicated that the defendant had an argument with the Harrises about their not paying their rent. As a result of this argument, she had the doors to the Harris' apartment removed. Upon being discovered, two colored men, apparently friends or relatives of the Harrises, had threatened her life. The police were called. The defendant was upset and hysterical. She did not intend to injure any person there. The rifle was discharged accidentally by the defendant when she picked it up from where it was lying on a cedar chest in front of the window in the living room of the apartment. Had this testimony been believed by the jury, the defendant would have been acquitted of the charges.

## *Contentions on Appeal*

The defendant urges that (1) she was subjected to double punishment by being sentenced on both counts; (2) the instructions given were erroneous in that the jury was told that an inconsistent statement of a witness could be considered as evidence and not merely to discredit him; (3) the court erred in failing to instruct on its own motion concerning drawing, exhibiting or using a firearm, under section 417, Penal Code, a claimed lesser but necessarily included offense; (4) the court erred in failing to instruct on its own motion concerning the crime of simple assault; (5) the evidence is insufficient to support the judgment, and (6) the court erred in instructing on transferred intent in an assault case since no touching, injury or harm resulted to the person to whom the intent is transferred.

It is unnecessary to discuss the question of double punishment proscribed by section 654 of the Penal Code as we are convinced, for reasons hereinafter stated, that the conviction upon count I of the information must be set aside.

The claimed error in instructing the jury that an inconsistent statement of a witness could be considered as evidence and not merely to discredit him, relates to the testimony of Eugene Wilhelm, 14 years of age, who stated that the defendant was his great-aunt. He testified to ownership of the .22 caliber rifle used by the defendant and that he was on the premises during the dispute and subsequent discharge of the rifle. On cross-examination he testified in part as follows: "Q. Did you ever talk to the man who is seated to my right? A. I don't really know. Q. Have you ever seen this man before, Officer Fuske? A. I couldn't say. Q. Do you remember talking to a police officer from the Compton Police Department at about, oh, 10:45 the next morning after this happened? A. No. Q. How old are

you now? A. Fourteen. Q. How old were you on July 14th of last year? A. Thirteen. Q. Do you recall telling the officer that you were living at 1005 Orange Street in Long Beach? A. Yes. Q. Do you remember telling him that on the evening of the shooting you were inside of 718 East Cypress with your mother, Bessie Wilhelm, and Mrs. Birch? A. I can't remember. I probably did. Q. You can't remember telling an officer that. You did speak to an officer about what had occurred on the 13th of July, didn't you? A. I probably did, yes. Q. And you remember saying that you heard some threats made against Mrs. Birch by a man standing out in front of the house? A. Yes. Q. Do you remember that you said that this man went away, and at the time he went away you went and got your .22 caliber rifle out of the bedroom and gave it to Mrs. Birch? A. No. Q. You don't remember saying that, or you didn't say it? A. I don't remember saying that. Q. And that you saw Bessie Wilhelm give Mrs. Birch some ammunition for the rifle? A. No, because I was the only one that had the ammunition, and I was the one that——. I kept it on the TV. Q. Do you remember telling the police officers that at the time you saw Bessie Wilhelm give Mrs. Birch the ammunition you saw Mrs. Birch load the rifle, and then place the rifle on the cedar chest that sits in front of the living room window? A. No, I didn't say that. Q. Do you remember telling the officer that when the police officers were at 718 Cypress along with some other people, you saw your aunt Mrs. Birch fire the rifle through the window while she was sitting on the cedar chest? A. No. She was in motion to sit on the cedar chest."

Harold Fuske, an investigating officer, called in rebuttal, testified in part as follows concerning a conversation he had with Eugene Wilhelm on July 14, 1967: "Q. Did Eugene Wilhelm tell you at this conversation that he gave a .22 caliber rifle to his aunt Mrs. Birch? A. He did. Q. Did he tell you that he then saw his mother Bessie Wilhelm give his aunt Mrs. Birch some ammunition for this rifle? A. He did. Q. Did he tell you that he saw Mrs. Birch load the rifle and then place it on the cedar chest that sits in front of the living room window? A. He did. Q. Did he tell you that when the officers were at the house, that along with other people he observed his aunt fire, that his aunt Pearl Birch fired the rifle through the window while she was sitting on the cedar chest? A. He did. Q. Did you make any notations of this conversation? A. Original notes. Q. When did you make these notes? A. As soon as we got back to the station. I took rough notes while talking to him, and made complete notes there that day at the station. Q. Have you refreshed your recollection with these notes and the statements that you had prepared? A. I have."

On surrebuttal, Bessie Wilhelm, the stepmother of Eugene, testified that

she was present at the conversation between Officer Fuske and Eugene, and that the statements attributed by Officer Fuske to Eugene were not made.

The trial court instructed the jury as follows: "A witness' inconsistent statements may be considered as evidence of the matters stated and not merely as evidence casting discredit on a witness." Section 1235 of the Evidence Code appears on the instruction as authority for its context.

It is held that the admission of a statement such as is shown here, as substantive evidence, is error of federal constitutional dimensions. Such error, however, does not automatically deprive a defendant of a fair trial. (*People* v. *Johnson,* 68 Cal.2d 646, 660 [68 Cal.Rptr. 599, 441 P.2d 111].) The governing test of prejudice, therefore, is that laid down in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. In view of the strong evidence of defendant's guilt by eyewitness testimony, the testing of the rifle for accidental firing, coupled with her admission to Officer Herpin, we are satisfied that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra.*)

Violation of section 417 of the Penal Code is not a lesser but necessarily included offense within the charge of assault with a deadly weapon (*People* v. *Torres,* 151 Cal.App.2d 542, 544-545 [312 P.2d 9]), or assault with intent to commit murder (*People* v. *Siplinger,* 252 Cal. App.2d 817, 823 [60 Cal.Rptr. 914]). Furthermore, the defendant's defense was that the rifle discharged accidentally, not that she fired it with intent to frighten the victims. (See *People* v. *Wilson,* 66 Cal.2d 749, 756 [59 Cal.Rptr. 156, 427 P.2d 820].) In this state of the record the trial court was not bound to instruct on section 417 of the Penal Code, and its failure to do so was not error.

Next, the defendant contends that the trial court erred in failing, of its own motion, to instruct on simple assault, a lesser but necessarily included offense within the charge of assault with a deadly weapon.

Here, if the defendant's witnesses were believed, she would be acquitted of the charges. If they were disbelieved, and the version of the prosecution's witnesses was accepted, she stands properly convicted of the charge under count II of the information. There is no middle ground. It was not error for the trial court to fail, of its own motion, to instruct on the lesser offense, where, under the evidence, there was no middle ground to support such an instruction. (See *People* v. *Mitchell,* 61 Cal.2d 353, 363 [38 Cal.Rptr. 726, 392 P.2d 526]; *People* v. *Morrison,* 228 Cal. App.2d 707, 712-713 [39 Cal.Rptr. 874].)

The defendant urges that the evidence is insufficient to support the

judgment. This contention is without merit. There is substantial evidence in the record to support the jury's finding of guilt upon count II of the information.

■ The defendant contends that the court erred in instructing the jury that "When one intends to assault a certain person, and by mistake or inadvertence assaults another person, in the eyes of the law his intent is transferred from the person to whom the assault was directed to the person actually assaulted; and a person committing such an act is deemed guilty of assault, in like effect as if he had originally intended to attack the person thus assaulted through mistake or inadvertence."

The reason for the giving of this instruction under the facts disclosed by the record is not clear. The jury was instructed in part that "To constitute an assault with a deadly weapon, actual injury need not be caused. The characteristic and necessary elements of the offense are the unlawful attempt, with criminal intent, to commit a violent injury upon the person of another, the use of a deadly weapon in that attempt, and the then present ability to accomplish the injury."

■ All that is required to sustain a conviction of assault with a deadly weapon is proof that there was an assault, that it was with a deadly weapon, and that the defendant intended to commit a violent injury on another. (*People* v. *Corson,* 221 Cal.App.2d 579, 582 [34 Cal.Rptr. 584].) ■ A battery, or a wounding is not necessary in order to sustain a conviction for assault with a deadly weapon. (*People* v. *Laya,* 123 Cal.App.2d 7, 15-16 [266 P.2d 157].) Here, there is substantial evidence to show that the defendant intended to commit a violent injury upon the person of Roderick Ferguson. Had the bullet intended for Ferguson struck Officer Council there could be no doubt that the intent to injure Ferguson would be transferred to Officer Council, and in these circumstances the defendant would be guilty of assault with a deadly weapon against both Ferguson and Council. ■ However, the bullet intended for Ferguson did not strike Officer Council and there is no evidence in the record that the bullet fired at Ferguson was intended to inflict a violent injury upon Officer Council. Therefore, the evidence is insufficient to sustain the judgment as to count I of the amended information charging assault upon Officer Council. This is not to say that an assault with a deadly weapon may not be perpetrated against two or more victims by the firing of a single shot where the bullet does not strike any one of the intended victims. ■ The criticized instruction bearing upon transferred intent is harmless as it may relate to count II of the amended information charging assault upon Rod[erick] Ferguson.

The judgment is reversed as to count I of the information, and is affirmed with respect to count II of the information.

Kaus, P. J., and Reppy, J., concurred.