[No. E045598. Fourth Dist., Div. Two. Feb. 9, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ANGEL TRUJILLO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B–D.

## COUNSEL

Kristin A. Erickson, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KING, J.**—While riding in a car, defendant Angel Trujillo fired numerous shots from a semiautomatic rifle at another moving car. The other car had two occupants, a driver and a backseat passenger. At least two bullets hit the car, but neither occupant of the car was hit. Defendant was charged with two counts of attempted murder (counts 1, 2; Pen. Code, §§ 187, subd. (a), 664),[1] two counts of assault with a semiautomatic firearm (counts 3, 4; § 245, subd. (b)), and one count of discharging a firearm into an occupied vehicle (count 5; § 246). It was further alleged in connection with the assault charges that defendant personally used a firearm. (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8).) A jury acquitted him of the attempted murder charges, convicted him of the other charges, and found true the allegation that he personally used a firearm. He was sentenced to 15 years in prison.

On appeal, defendant contends (1) the evidence is insufficient to convict him of two counts of assault because he had no knowledge of the backseat

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

passenger in the car he was shooting at; (2) the court erred in failing to apply section 654 to stay the sentence on count 5 (shooting at an occupied vehicle); (3) the imposition of consecutive terms violated his rights to a jury trial and due process; and (4) the court erred in instructing the jury that it may not consider defendant's voluntary intoxication for any purpose other than in deciding whether defendant acted with an intent to kill or with deliberation and premeditation. In the published portion of our opinion, we conclude the evidence is sufficient to support convictions for assault with a semiautomatic firearm as to both occupants of the car even if defendant did not actually see the backseat passenger. In the unpublished portion of the opinion we hold that the sentence for count 5 must be stayed pursuant to section 654 and reject defendant's other contentions. We will modify the judgment to reflect the stay and affirm the judgment as modified.

## I. SUMMARY OF FACTS

A. *Prosecution Case*

In the evening of January 6, 2006, defendant and two of his friends, Steven Valdez and Jose Ruano, met at defendant's residence.[2] Valdez had driven to the house in his girlfriend's white Chevrolet Cavalier. The three friends talked and drank beer and tequila. Valdez told the others how his girlfriend's former boyfriend, "Adan," had tried to pick a fight with him at a party. Valdez said he wanted to confront and fight Adan, and the other two agreed to go with him. They did not discuss taking weapons with them. Before getting into the Cavalier, defendant went into the house to get his coat. When he returned to the car, he had a rifle hidden underneath the coat. Valdez drove the Cavalier, defendant was in the front passenger seat, and Ruano was in the backseat.

Adan's house is on a street corner with a stop sign. When Valdez pulled up to Adan's house, he saw someone outside the house, but could not tell who it was. Defendant yelled something out the window and Valdez "took off." Valdez then made a U-turn and drove back toward Adan's house. He stopped at the stop sign, facing the house.

Meanwhile, Edgar Padilla was driving his black Honda Civic with his neighbor, Christian Arias, in the backseat. They were chasing after people in a Ford Mustang convertible who, just moments earlier, used paintball guns to hit Padilla's car with paintballs. They came upon the Cavalier driven by

---

[2] The prosecution's case was based in large part upon the testimony of Valdez. Pursuant to a plea bargain, Valdez pled guilty to a crime arising from the events of January 6, 2006, and agreed to testify truthfully about the events of that evening.

Valdez as it was stopped at the intersection outside Adan's house. Padilla drove up behind the Cavalier. When the Cavalier did not move, Padilla drove quickly around it and turned left at the intersection. No one in the Civic said anything or made any gestures toward the people in the Cavalier.

Padilla's Civic had tinted windows and Valdez could not see who was in the car. Defendant told Valdez that Adan was in the Civic, so Valdez started to follow the Civic. Defendant pulled the rifle out from under his coat, leaned out of the window, and shot four to seven shots at the Civic. Padilla and Arias thought the shots were from a paintball gun. Padilla slammed on the brakes, stopping the Civic in the middle of the street, and dialed 911. Valdez then pulled around the Civic and drove off in front of it. Padilla could see that there was a driver, a passenger, and someone in the backseat of the Cavalier, but he could not see them well enough to identify them. Padilla followed the Cavalier onto the freeway. After getting through to a 911 operator and telling her the license plate number on the Cavalier, he stopped chasing the Cavalier.

The next morning, Padilla discovered that his car had been hit by bullets. He found bullet holes in the trunk lid and the muffler, and a .22-caliber bullet underneath his seat.

In February 2006, defendant's father told police that defendant lived in his house in January 2006 and that he owned three rifles at that time, including a .22-caliber rifle. He said that the .22-caliber rifle had been missing for two weeks.

The gun used in the shooting was not in evidence. Based upon testimony regarding the rapidity of the shots and Valdez's description of the gun that defendant used in the shooting, a detective testified that the gun was a semiautomatic firearm.

B. *Defense Case*

Defendant testified in his defense. In January 2006, he was 20 years old. He said he had been a heavy drinker since he was 15 years old. In the afternoon and evening of January 6, 2006, he drank approximately 10 beers, plus some brandy or scotch. He had also used cocaine that day. Valdez and Ruano were drinking with him. Valdez complained about Adan and his friends, saying " 'I'm tired of these fools' " and, later, " 'I think I know where they're kicking at.' " Defendant told Valdez, " 'Well, let's go whip their ass,' " and " 'let's go fight them.' " Defendant further testified that if "the people weren't going to be there, we were going to shoot the windows out of his car."

Valdez told defendant that Adan drove a black Honda Civic. Defendant told the others that he would take "the little .22." Defendant also testified that

he told Valdez, " 'If it's him and his friends,' which they usually hang out, I was like, 'We can—you know, we can all be there.' " Later in his testimony he explained that Adan usually "hangs around with more than just one guy," and "if it would have been one on one, [Valdez] wouldn't have needed us to go with him."

They drove around to "the local spots where they usually throw parties" and did not see the car. Then they drove to Adan's house. There, a black Honda Civic drove up behind them, then pulled up around them "pretty fast." Defendant told the others, " 'Hey, that's the Civic. That's the black Civic.' " Valdez responded, " 'Yeah, that's them. That's them.' " Defendant then shot three, four, or five shots at the Civic. He said he was trying to shoot out the windows of the car. Valdez told him, " 'I know that's them fools. I know that's them.' " The driver of the Civic then started chasing them.

Defendant testified that he was not trying to kill anyone.

## II. ANALYSIS

### A. *Sufficiency of the Evidence of Assault With a Firearm*

Defendant was convicted of two counts of assault with a firearm, one for each person in the Civic. On appeal, he argues the evidence is sufficient to support one count of assault, but not two. He contends he cannot be convicted of both counts because there is no evidence that he knew that the backseat passenger, Arias, was in the Civic.[3] We disagree.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations]." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

 Section 245, subdivision (b), makes it a crime to commit an assault with a semiautomatic firearm. "An assault is an unlawful attempt, coupled

---

[3] The People argue that defendant forfeited this claim because he never argued to the jury or to the trial court that he could be found guilty of only one count of assault with a firearm because he did not know there was more than one person inside the Civic. We agree with defendant that an argument that the evidence is insufficient to support a verdict is never waived. (See *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 129 [18 Cal.Rptr.3d 550]; *People v. Parra* (1999) 70 Cal.App.4th 222, 224, fn. 2 [82 Cal.Rptr.2d 541] [Fourth Dist., Div. Two].)

with a present ability, to commit a violent injury on the person of another." (§ 240.) Here, there is no dispute that defendant had the present ability to inflict a violent injury on both persons inside the Civic; he fired at least three shots at the Civic, hitting it at least twice. Indeed, because defendant shot at the Civic from behind, Arias, the backseat passenger, was more likely to be hit than Padilla, the driver. The actus reus element of assault as to both Arias and Padilla was thus met. Defendant contends, however, that he did not have the requisite mental state for assault as to Arias because he was not actually aware that there was a second person in the Civic when he shot at the car. As we explain below, we conclude that defendant had the requisite mental state for assault even if he did not have actual knowledge of each specific victim of his assault.

■ The California Supreme Court has addressed and attempted to clarify the nature of the mental state for assault in *People v. Rocha* (1971) 3 Cal.3d 893 [92 Cal.Rptr. 172, 479 P.2d 372] (*Rocha*), *People v. Colantuono* (1994) 7 Cal.4th 206, 213 [26 Cal.Rptr.2d 908, 865 P.2d 704] (*Colantuono*), and *People v. Williams* (2001) 26 Cal.4th 779, 784 [111 Cal.Rptr.2d 114, 29 P.3d 197] (*Williams*). In *Rocha*, the defendant swung at his victim with a knife, cutting him. (*Rocha, supra*, at p. 896.) He asserted that he acted in self-defense and had no intention of stabbing the victim. He was convicted of assault with a deadly weapon. On appeal, he argued that the trial court erred in refusing to instruct the jury that the crime required a specific intent to injure. (*Ibid.*) The Supreme Court rejected the argument and held that "assault with a deadly weapon is a general intent crime." (*Id.* at p. 899.) More specifically, "the criminal intent which is required for assault with a deadly weapon . . . is the general intent to wilfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another. Given that intent it is immaterial whether or not the defendant intended to violate the law or knew that his conduct was unlawful. The intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary." (*Ibid.*, fns. omitted.)

In *Colantuono*, the California Supreme Court reexamined the mens rea requirement for assault, noting that "a certain measure of understandable analytical uncertainty continues." (*Colantuono, supra*, 7 Cal.4th at p. 215.) The court explained: "[T]he question of intent for assault is determined by the character of the defendant's willful conduct considered in conjunction with its direct and probable consequences. If one commits an act that by its nature will likely result in physical force on another, the particular intention of committing a battery is thereby subsumed. Since the law seeks to prevent such harm irrespective of any actual purpose to cause it, a general criminal intent or willingness to commit the act satisfies the mens rea requirement for assault. . . . [¶] . . . [F]or assault, as with any general intent crime, the nature

of the defendant's *present willful conduct* alone suffices to establish the necessary mental state without inquiry as to an intent to cause further consequences. [Citations.] Accordingly, upon proof of a willful act that by its nature will directly and immediately cause ' "the least touching," ' 'it is immaterial whether or not the defendant intended to violate the law or knew that his conduct was unlawful. The intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary.' [Citation.] The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm. [Citation.] Because the nature of the assaultive conduct itself contemplates physical force or 'injury,' a general intent to attempt to commit the violence is sufficient to establish the crime." (*Id.* at pp. 217–218, fns. omitted.) The court further explained: "[T]he necessary mental state [for assault] is 'an intent merely to do a violent act.' [Citation.] The consequences of that act serve only to inform the inquiry of whether the defendant attempted physical force against the person of another; but they are not controlling. Once the violence is commenced, 'the assault is complete.' [Citation.]" (*Id.* at p. 219.)[4]

In *Williams*, the Supreme Court stated that *Colantuono*'s description of the mens rea for assault "arguably implies an objective mental state consistent with a negligence standard." (*Williams, supra*, 26 Cal.4th at p. 787.) Because *Colantuono*'s language "may have been confusing," the court again sought to clarify the mental state required for assault. (*Williams, supra*, at p. 787.) The court explained that "a defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*Id.* at pp. 787–788.) The test is thus an objective one: the defendant "need not be subjectively aware of the risk that a battery might occur." (*Id.* at p. 788, fn. omitted; see *People v. Wright* (2002) 100 Cal.App.4th 703, 706 [123 Cal.Rptr.2d 494].) The *Williams* court also expressly "reaffirm[ed] that assault does not require a specific intent to injure the victim." (*Williams, supra*, at p. 788.)

---

[4] Justice Kennard disagreed, stating that she would "hold that assault is a specific intent crime that requires that the defendant intend to injure the victim." (*Colantuono, supra*, 7 Cal.4th at p. 225 (dis. opn. of Kennard, J.).)

■ Neither *Rocha, Colantuono,* nor *Williams* involved convictions for assaults against multiple victims and they did not address whether the defendant must be aware of the presence of each charged victim of the assault.[5] A recent Court of Appeal decision interpreting *Williams* indicates that a defendant who assaults one person will be liable for assaulting others who are "reasonably foreseeable." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1628 [92 Cal.Rptr.3d 239] (*Felix*); see also *People v. Tran* (1996) 47 Cal.App.4th 253, 262 [54 Cal.Rptr.2d 650].) As the *Felix* court explained: "[N]o subjective intent to injure a particular victim is required. Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable." (*Felix, supra,* at p. 1629.)

The *Felix* court relied on *People v. Riva* (2003) 112 Cal.App.4th 981 [5 Cal.Rptr.3d 649] (*Riva*). In that case, the defendant fired shots from one car at the occupants of another car. He did not hit anyone in the other car, but did hit a pedestrian, Ms. Lindsey, walking nearby. (*Id.* at p. 986.) The jury was not instructed in accordance with the *Williams* decision that the defendant must have actual knowledge of facts to indicate that the defendant's act would probably result in a battery. (*Riva, supra,* at p. 997.) The court held, however, that the error was harmless. It explained: "The shooting took place on a February evening at approximately 5:00 p.m., when people are normally returning from work, school or shopping. Although it would have been dark at that time of day, the shooting took place in an urban neighborhood consisting of residences such as Gold Star Manor, where Ms. Lindsey lived, and small businesses . . . . Ms. Lindsey, her friend Ms. Warren, and Ms. Lindsey's two grandchildren had just left the market and were approaching the gate to Gold Star Manor when [the defendant] shot Ms. Lindsey. There were other pedestrians, including her grandchildren, and 'a lot of cars' in the area when the shooting occurred. [¶] The facts in this case would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike a pedestrian and a battery

---

[5] The court came close to considering this issue in *In re Tameka C.* (2000) 22 Cal.4th 190 [91 Cal.Rptr.2d 730, 990 P.2d 603], a case decided after *Colantuono* and before *Williams*. In *Tameka C.*, the defendant fired gunshots in the direction of three police officers. She missed the officers, but shattered the glass in a door of a nearby hotel. A child inside the hotel was struck in the eye by the shattered glass. (*In re Tameka C., supra,* at p. 192.) It does not appear that the defendant knew of the child's presence inside the hotel. The defendant was nevertheless found to have committed assault with a firearm against the child as well as the three police officers. (*Ibid.*) The defendant did not challenge the sufficiency of the assault convictions before the Supreme Court. (*Id.* at p. 197.) Instead, review was limited to the issue of whether separate firearm enhancements can be imposed when "a defendant commits an assault with a firearm upon an intended victim, and with the same shot injures an unintended victim, thereby committing another assault . . . ." (*Id.* at p. 191.) The court answered this question in the affirmative. (*Id.* at p. 200.) Although there is language in the opinion that suggests that the underlying assault conviction would be upheld (see, e.g., *id.* at pp. 198–199), the court made clear that that issue was not before it.

would directly, naturally and probably result from his conduct." (*Id.* at p. 998, fn. omitted.) The opinion does not indicate or suggest that the defendant saw or was actually aware of Ms. Lindsey.

The *Riva* court relied in part on *People v. Bland* (2002) 28 Cal.4th 313 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*). (See *Riva, supra,* 112 Cal.App.4th at p. 999 & fn. 65.) Although *Bland* did not directly address the requirements for assault, it is also instructive here. In that case, a defendant and an accomplice shot multiple times at a car driven by Kenneth Wilson, their primary target. As a result, Wilson was killed and two passengers in the car were hit with bullets. (*Bland, supra,* at p. 318.) The defendant was charged with and convicted of the murder of Wilson and the attempted murders of the two injured passengers. (*Ibid.*) In discussing the nature of mens rea, the court explained: " 'Criminal *acts*, consummated or inchoate, are discrete events that can be both pinpointed and counted. A *mens rea*, by contrast, is an elastic thing of unlimited supply. It neither follows nor fails to follow the bullet. It does not go anywhere. It remains in the brain of the criminal actor and never moves. It may combine with a single *actus reus* to make a single crime. It may as readily combine with a hundred *acti rei*, intended and unintended, to make a hundred crimes, consummated and inchoate. Unforeseen circumstances may multiply the criminal acts for which the criminal agent is responsible. A single state of mind, however, will control the fact of guilt and the level of guilt of them all.' [Citation.]" (*Id.* at p. 325; see also *People v. Concha* (2009) 47 Cal.4th 653, 660–661 [101 Cal.Rptr.3d 141, 218 P.3d 660].)

██ If we apply this view of mens rea to the crime of assault, a defendant who harbors the requisite mental state for assault while committing one or more acti rei such that a direct, natural, and probable result is a battery against two persons may be convicted of assault against each. Here, there is no dispute that the firing of multiple gunshots from a semiautomatic weapon at the Civic is an "action [or are actions] enabling him to inflict a present injury" on anyone inside the Civic, thus constituting an actus reus or multiple acti rei of assault. (See *People v. Chance* (2008) 44 Cal.4th 1164, 1172 [81 Cal.Rptr.3d 723, 189 P.3d 971].) Nor is it reasonably disputed that defendant had the requisite mental state for assault required by *Williams*: he was actually aware that he was shooting at an occupied car in a manner that would lead a reasonable person to realize that a battery against another would directly, naturally, and probably result. (See *Williams, supra,* 26 Cal.4th at pp. 787–788.) Even if he was not actually aware of the second person in the Civic, his mental state can be "readily combine[d]" with the actus reus (or acti rei) of shooting at the car with two people inside to " 'multiply the criminal acts for which the [defendant] is responsible.' " (*Bland, supra,* 28 Cal.4th at p. 325.) Just as "a person maliciously intending to kill is guilty of the murder of all persons actually killed" (*id.* at pp. 323–324), a person who

harbors the requisite intent for assault is guilty of the assault of all persons actually assaulted.[6] (See, e.g., *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 351 [211 Cal.Rptr. 742, 696 P.2d 134] [defendant may properly be convicted of multiple counts for multiple victims where the act prohibited by the statute is centrally an act of violence against the person]; *People v. Smart* (2006) 145 Cal.App.4th 1216, 1224 [52 Cal.Rptr.3d 456] [for assault, "there are as many crimes as there are victims"].)

■ Because the gravamen of assault is the *likelihood* that the defendant's action will result in a violent injury to another (see *Williams, supra*, 26 Cal.4th at p. 787; § 240), it follows that a victim of assault is one for whom such an injury was likely. Arias, sitting in the backseat of the Civic nearest to defendant's fusillade of gunshots, was no less a victim of defendant's assault than the driver of the Civic. Therefore, defendant can be charged with and convicted of assault against both occupants of the car even if defendant did not actually see Arias in the backseat.

Support for this view can be found in cases involving acts of violence that create a zone of harm encompassing multiple potential victims. (E.g., *People v. Vang* (2001) 87 Cal.App.4th 554 [104 Cal.Rptr.2d 704] (*Vang*); *Bland, supra*, 28 Cal.4th 313; *People v. Adams* (2008) 169 Cal.App.4th 1009 [86 Cal.Rptr.3d 915] (*Adams*).) In *Vang*, the defendants fired numerous gunshots at two residences for the purpose of killing two specific individuals. Defendants were charged with and convicted of, among other crimes, attempted murder against persons who were inside the residences but not seen by the defendants. The Court of Appeal affirmed the convictions because the jurors could have reasonably concluded that the "defendants harbored a specific intent to kill every living being within the residences they shot up." (*Vang, supra*, at p. 564.) Thus, the defendants were found to have had the requisite intent to support convictions for attempted murder even as to persons inside the houses whose presence was unknown to the defendants.

In *Bland, supra*, 28 Cal.4th 313, the California Supreme Court cited *Vang* with approval and adopted the rationale of a Maryland case to explain how one who intends to kill a primary target may also be found to harbor the requisite intent to kill others nearby: " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary

---

[6] This view of the mens rea was applied in an assault case by the Massachusetts Supreme Court in *Commonwealth v. Melton* (2002) 436 Mass. 291 [763 N.E.2d 1092]. In that case, a defendant shot a single bullet at a car with four people inside. The court affirmed convictions for four counts of assault, stating: "[T]he requisite mens rea needs to be shown, but it does not need to be shown separately or independently for each victim. Rather, once established as to any victim, it satisfies that element with respect to all other victims, even if those victims are unintended or even unknown to the defendant." (*Id.*, 763 N.E.2d at p. 1098.)

victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Bland, supra,* at pp. 329–330, quoting *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984, 1000–1001]; see also *People v. Smith* (2005) 37 Cal.4th 733, 745–746 [37 Cal.Rptr.3d 163, 124 P.3d 730].)

In *Adams,* the defendant intentionally started a fire on the back porch of a house. Four people were inside the house. One was killed. Defendant was convicted of the murder of the person killed and attempted murder of the other three. (*Adams, supra,* 169 Cal.App.4th at pp. 1012–1013.) The defendant argued she could not be convicted of the attempted murders because she did not know that the three survivors were in the house. (*Id.* at p. 1020.) The Court of Appeal disagreed. The court explained: "[T]he concurrent intent doctrine permits a rational jury to infer the required express malice from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. The concurrent intent theory recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person or persons. The theory imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die. *Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm.*" (*Id.* at p. 1023, italics added.)

█ *Vang* and *Adams* involved attempted murder convictions, not assault. Nevertheless, if the defendants in *Vang* and *Adams* harbored the specific intent to kill people inside buildings when they were unaware that such persons were in the buildings, it would be absurd to find that they did not also have the mental state required to be convicted of assault against those same victims; the specific intent to kill everyone in a building by shooting them (*Vang*) or burning them (*Adams*) necessarily includes an awareness of facts (shooting into or burning an occupied residence) such that a reasonable person would realize a battery against such persons would directly, naturally, and probably result from his or her conduct. Here, defendant had the requisite mental state for assault and essentially created a zone of harm inside the Civic when he shot a flurry of bullets at it. Just as the evidence would have supported convictions for attempted murder of Padilla and Arias under *Vang* and *Adams* under a kill zone theory, the evidence is sufficient to support the convictions of assault against both occupants of the Civic.

Even if the "elastic" mens rea concept described by *Bland* or the kill zone theory does not apply here, we would conclude that Arias was a reasonably foreseeable victim of defendant's assault under the rationale expressed in *Felix* and *Riva*. The jurors could have reasonably found that a person with actual knowledge that he is shooting indiscriminately at a moving vehicle would realize that his conduct would directly, naturally, and probably result in a battery to anyone and everyone inside the Civic. Passengers in cars are no less foreseeable than the pedestrian who was hit in *Riva*. Indeed, because the bullets were shot directly at the car from behind the car, the likelihood that a backseat passenger such as Arias would be hit was at least as great as the probability of hitting the pedestrian in *Riva*. Whether defendant was subjectively aware of such risk or had the specific intent to injure any occupant of the car is irrelevant. (*Williams, supra*, 26 Cal.4th at p. 788; *Felix, supra*, 172 Cal.App.4th at p. 1629.) Accordingly, for all of the above reasons, we reject defendant's argument that the evidence is insufficient to support the conviction for assault against Arias.[7]

---

[7] Defendant relies upon *People v. Birch* (1969) 3 Cal.App.3d 167 [83 Cal.Rptr. 98], *People v. Spence* (1970) 3 Cal.App.3d 599 [83 Cal.Rptr. 711], and *People v. Lathus* (1973) 35 Cal.App.3d 466 [110 Cal.Rptr. 921]. *Birch* was decided before *Rocha, Colantuono*, and *Williams*. To the extent that it holds that a defendant must intend to injure the victim, such holding was correctly criticized by the *Felix* court as contrary to the Supreme Court's subsequent cases. Neither *Spence* nor *Lathus* addressed the question whether a defendant who is guilty of assault against one person can be liable for assault of a second, unseen, person within the zone of harm created by the assault. Opinions are not authority for propositions not considered. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

Defendant also relies on the *Williams* court's analysis of harmless instructional error. In *Williams*, the trial court did not instruct the jury on the requirement that the defendant have actual knowledge of facts sufficient to establish that his act by its nature would probably and directly result in a battery. (*Williams, supra*, 26 Cal.4th at p. 790.) The Supreme Court found

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION

The judgment is modified to reflect a stay, pursuant to section 654, of the sentence imposed on count 5. So modified, the judgment is affirmed. The court is directed to modify the abstract of judgment to reflect the staying of the sentence on count 5. The court is further directed to send a copy of the modified abstract of judgment to the Department of Corrections and Rehabilitation.

McKinster, Acting P. J., and Richli, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 20, 2010, S180948. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.

---

the error harmless, in part because the jury deadlocked on assault charges as to the victim's children, whose presence may not have been known to the defendant. This suggests that the jurors did consider the defendant's knowledge in convicting him on one count of assault. The court did not hold, however, that the *Williams* jury could have convicted the defendant of assault against the children *if, and only if,* the defendant had actual knowledge of the presence of the children. The sufficiency of the evidence supporting the charges of assault against the children was simply not before the court.

*See footnote, *ante,* page 1344.