Filed 12/10/13  P. v. Lopez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055859 |
| v. | (Super.Ct.No. SWF1101520) |
| MICHAEL JONATHAN LOPEZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Angel M. Bermudez, Judge.  Affirmed.

Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, A. Natasha Cortina, and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael Jonathan Lopez was at a party in Hemet when he got involved in an argument with two men whom he believed were bothering a girl he had brought to the party. When the argument escalated, he fired two shots from a .9 millimeter semi-automatic firearm he had in his possession into a nearby cement patio. Fragments from the bullets struck five other partygoers.

Defendant was convicted of five counts of assault with a semiautomatic firearm, in addition to weapons use and great bodily injury enhancements. He was found not guilty of an active participation gang enhancement alleged pursuant to Penal Code section 186.22, subdivision (a).[1] Defendant now contends on appeal as follows:

1. The trial court erred by denying his section 995 motion to dismiss the active participation in a gang charge prior to trial (§ 186.22, subd. (a)) and the resulting admission of the gang evidence violated his federal Constitutional rights to due process and a fair trial.

2. He received ineffective assistance of counsel due to his trial counsel's failure to move to exclude his pretrial statements which were the result of false promises of leniency and threats by the interrogating officer.

3. Insufficient evidence supported his convictions for assault with a deadly weapon because he lacked the requisite intent.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# I

## PROCEDURAL BACKGROUND

Defendant was charged in counts 1 through 5 with assault with a semiautomatic firearm pursuant to section 245, subdivision (b), against five separate victims. As to all counts, it was alleged that defendant personally used a firearm (§ 12022.5, subd. (a)), and as to counts 1 through 4, it was alleged he personally inflicted great bodily injury (§ 12022.7, subd. (a)). Defendant was charged in count 6 with actively participating in the criminal street gang Elsinore South Side (ESS) (§ 186.22, subd. (a)).

The jury found defendant guilty of counts 1 through 5 and found all the special allegations true for those counts. The jury found defendant not guilty of count 6. Defendant was sentenced to state prison for a total term of 19 years.

# II

## FACTUAL BACKGROUND

A. *People's Case-in-Chief*

1. *Victims and eyewitnesses*

On June 11, 2011, Shawna and Jordan Chambers (brother and sister) rented out their house for a party. The promoters of the party were tasked with searching partygoers for weapons prior to entrance. The party was held in the backyard and the cement patio served as the dance floor.

Around 1:00 a.m., Shawna was outside talking with her friends. She heard three gunshots come from the backyard, where she estimated there were 30 people. Jordan also heard three gunshots. Shawna ran into the house. Shawna ran out the front door of

3

the house to see what was happening. As she was in front of the house, she saw people running out from the backyard. She saw defendant running from the backyard carrying a gun. Defendant was not with anyone and appeared "panicked." Jordan could not identify defendant but did see someone with a gun waving it around appearing to try to get the persons around him to back up.

Shawna recalled that she had searched defendant when he had entered the party and had not found a gun. He entered the party with a girl.

Jeffrey Aquino was standing talking to two girls at the party. He estimated there were about 30 to 40 other people at the party. Aquino heard two gunshots and then felt like a "wave" below his waist. He was hit on his penis. Aquino saw a Hispanic male holding a gun but he could not identify him. Aquino was covered with blood below his waist. Aquino was treated at the hospital and received seven stitches on his penis. Metal pieces from the bullet were lodged in his penis that had to be removed. He was in pain and could not walk for the first week after he received the stitches.

Nicolas Roberts was also at the party with friends, including Jared Seebold. Roberts estimated there were 50 people at the party; Seebold estimated 100 people. Seebold heard yelling over the music. As Roberts and Seebold were sitting near the dance floor drinking vodka and smoking marijuana, they heard gunshots. Both of them were hit in the leg with bullet fragments. Seebold said the yelling and the gunshots came from the same area. Just prior to the shots, Seebold heard someone yell "Trece."[2]

---

[2] Hemet Trece was a Hispanic gang based in Hemet.

4

Roberts heard someone yell "Riverside" prior to the gunshots. Roberts heard from four to six gunshots. Roberts and Seebold put their hands on their wounds and walked to the front of the house. They sat down on the curb and were bleeding from their legs. Their wounds were the size of a quarter.

While Roberts was waiting on the curb to be taken to the hospital, he saw someone whom he could not identify with either a ".22 Glock" or a .9 millimeter Berretta.

Roberts still had three bullet fragments lodged in his calf. His calf continued to be stiff. Roberts did not need stitches. Seebold was in a lot of pain and had blood shooting from his leg. He had a bullet fragment in his calf. He could not put weight on his leg for three weeks. Seebold heard a girl say after the shooting, "Let's go. You're gonna get in trouble. The cops will be here. Let's go."

Christopher Ruiz was also at the party. He heard two gunshots. A few seconds prior to hearing the gunshots, Ruiz heard someone say, "'I don't give an F[uck].'" Ruiz then felt something impact his leg. Ruiz ran to his car and drove home. He had two fragments in his leg. As he drove, blood soaked through his pants. Ruiz did not immediately seek medical attention because he was under the influence. Ruiz went to the hospital the following day. His friend had to help him because he could not walk on his own and could not move his knee. Both of the fragments eventually came out and one was the size of a dime. Ruiz had permanent scars.

Jason Obeid arrived at the party at 10:00 p.m. At some point, he heard shouting and yelling from where most of the partygoers were standing. He heard two gunshots. Obeid saw the gun but not the shooter. The gun was pointed toward the ground.

Heather Gallant estimated there were 40 people at the party and most of them were on the concrete dance floor.  She heard two gunshots.  Gallant saw a short Hispanic male wearing a hooded sweater holding the gun.  Gallant was hit by bullet fragments on her upper thigh.  She had three small holes on her leg.  She was not in too much pain because she was intoxicated.  She went to the hospital the following day.  Bruising from the fragments lasted two weeks and she did not need stitches.

2.    *Police investigation*

Riverside County Sheriff's Deputy Richard Vryheid was the first to respond to the shooting.  He saw people running in all different directions.  He did not see anyone with a weapon.  Deputy Vryheid found a .9 millimeter shell casing in the backyard.  He saw several marks on the ground where it appeared something struck the ground with great force and there was some blood splatter.  There was blood on the driveway.  There were specks of what appeared to be the outer casing of a bullet on the cement in the backyard.

Defendant spoke with Riverside County Sheriff's Detective John Juarez on June 17, 2011.  Detective Juarez informed defendant that he wanted to talk to him about a party he was at with a girl named "Trishana."[3]  Detective Juarez told defendant he was talking to many people who were at the party to find out what had happened.  He wanted to see what defendant saw and heard.

---

**3**       Although the transcript has her name spelled this way, she testified for the defense and stated her name was Tristana Frenes.

6

Defendant initially told Detective Juarez he went with Tristana to the party. While there, defendant heard people arguing. He then heard gunshots and screaming. Tristana grabbed him and told him they had to go.

Defendant went to a friend's house but did not want to tell Detective Juarez his friend's name. Defendant denied anyone yelled out Hemet. Defendant claimed he had no way of contacting Tristana.

Detective Juarez told defendant that he was seen with a gun and lied that his fingerprints were on the shell casing found in the backyard. He also told defendant witnesses had said that he shot into the ground. Detective Juarez told him that he knew he did not want to kill anyone but rather had been disrespected. Defendant was told he would only get a "straight possession of firearm and discharge of firearm" charge if he told the truth.

Defendant then admitted that he was the shooter but claimed he had gotten "into it with some guy." Defendant said that other guys were talking to Tristana about taking her home and defendant told them that she was with him. Defendant said he grabbed Tristana's hand and some guy got in his face. The guy wanted defendant to go and to leave Tristana at the party. Defendant was concerned that he was going to take advantage of Tristana so he "had to do" what he had to do. He took out his gun. Defendant said that it was a .9 millimeter and that he had since sold it. Defendant shot toward the stairs in order to get Tristana out of the party. Defendant felt that he was being disrespected. Defendant denied that he yelled "Hemet." He claimed he was not an ESS or Hemet Trece gang member.

7

Defendant was interviewed a second time. Defendant admitted having an "IE" tattoo on his chest. Defendant continued to state he could not contact Tristana. Defendant claimed he was drunk when he shot the gun and that he was upset with the guy at the party because he disrespected him and he did not know what he was going to do to Tristana.

Defendant further explicated the details of the shooting. He had found Tristana at the party talking to two guys. He told her it was time to leave the party and went to grab her hand. One of guys slapped his hand away and told him that Tristana was coming home with them. Defendant told them he was taking Tristana home. One of the guys got in his face and asked him what he was going to do. At that point, he took out his gun. Defendant said after the shots the guy was, "Fuckin' crying like a female." Defendant sold the gun the next day. Defendant continued to deny he was a gang member.

3.    *Gang testimony*

Joseph Doty was a senior probation officer for the Riverside County Probation Department. In 2007, he conducted a probation search of defendant's brother at the house where both he and defendant lived. ESS gang clothing was found in the room belonging to defendant's brother. A bat with nails driven through it (so it could be used as a club) was found in the cellar of the house. It had "IE," "13," and "Shadow" written on it. A BB gun was found with the writing "Elsinore South Side Sharky." In defendant's bedroom, a notebook with the writing "South Side 13" was found.

8

Hemet Police Officer Takashi Nishida was a member of the Riverside County Regional Gang Task Force. On October 6, 2007, he encountered defendant in Hemet. Defendant was 15 years old. Defendant had a tattoo of three dots on his hand. It was a typical tattoo that Hispanic gang members got that symbolized "mi vida loca," which meant "my crazy life."[4] The area where he was stopped was known as the territory of Hemet Trece or South Side Criminals. Defendant was documented as an ESS member that day. Four days later, defendant was with a documented Hemet Trece South Side criminal gang member. Defendant admitted he was an ESS member. Defendant said he was known as "Shadow" but did not call it a gang moniker.

Detective Juarez was also assigned to the gang task force. He was responsible for monitoring gangs in the Lake Elsinore area. A gang member liked the respect, camaraderie and notoriety that came from being in a gang. Committing violent crimes was a way to gain respect and to cause fear in the community. This fear made community members less likely to report crimes. If a gang member was disrespected by someone, the gang member would have to earn respect by retaliating.

Deputy Juarez had contact with the ESS gang. ESS used the number 13 or X13 as a symbol. They were also called "South Siders." The most prevalent crimes committed in June 2011 by ESS members were burglary, assault with a deadly weapon, weapons possession and narcotics sales. An ESS member had been convicted of burglaries in November and December 2009.

---

**4** It was not necessarily only gang members who had this tattoo.

9

Deputy Juarez helped in the investigation of the instant shooting. He interviewed Jordan and Shawna. He became aware that the moniker "Shadow" was connected to the shooting. Deputy Juarez looked up the gang moniker in a gang database. He was able to determine that defendant used this moniker. The notebook found in defendant's room with Sur 13 and Shadow on it would be gang graffiti. Defendant's brother was in ESS and known as Sharky.

Defendant's cellular telephone said Shadow on it. There was an alarm of some type on the phone that played a song called "13 reasons to be a Sureno."[5]

Detective Juarez was of the opinion that defendant was an active member of ESS on the day of the shooting. Detective Juarez did not believe that the crime was committed for the benefit of ESS,[6] just that defendant was an active participant in the gang.

Detective Juarez had only spoken with two other ESS gang members in his career. In 2005 and 2006, there were only 20 members of ESS. The group had dispersed and now there were only about six members still living in Lake Elsinore. Defendant did not have an ESS tattoo. No one claimed ESS the night of the shooting.

---

[5] Surenos was a term used for Hispanic gangs in Southern California.
[6] Defendant was not charged with the additional allegation under 186.22, subdivision (b) that the crime was committed on behalf of ESS.

10

B.      *Defense*

Tristana had known defendant for four or five years.  Tristana went to the party with defendant.  She drank several beers throughout the evening.  Two men at the party came up to her and claimed to have met her in the past.  They tried to convince her to go to the store with them to get more alcohol.  They put their arms around her.  Defendant approached and told her not to go to the store with them.  Tristana wanted to go with defendant but the men continued to hold her.  Defendant and the two men started exchanging words.  The men got closer to defendant and defendant backed up.  Defendant got out his gun and shot into the ground two times.  Defendant looked frightened after he shot the gun.

The two men left.  Tristana and defendant took off running.  Defendant did not point the gun at anyone that night.  Defendant had never told Tristana that he was a gang member.

III

DENIAL OF SECTION 995 MOTION TO DISMISS

Defendant contends that the trial court erred by denying his motion pursuant to section 995 to dismiss the active participation in a gang allegation alleged pursuant to section 186.22, subdivision (a) because *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*), which was decided after the trial in this case, makes it clear that to be convicted of the enhancement a gang member must commit a crime with another gang member.  Defendant contends that by denying the motion to dismiss, and allowing in

11

extensive gang evidence, his federal constitutional rights to due process and a fair trial were violated.

A.    *Additional Factual Background*

Prior to trial, defendant brought a motion to dismiss count 6. Defendant contended that the evidence presented at the preliminary hearing failed to establish that ESS was a criminal street gang. Vague testimony that ESS engaged in burglaries and weapons possession was not enough to establish that it was a criminal street gang. Further, there was no evidence that he was an active participant or that he knew that ESS members engaged in criminal activity. The People filed opposition essentially arguing that sufficient evidence was presented.

The trial court addressed the section 995 motion, finding that sufficient evidence was presented at the preliminary hearing to support that ESS was a criminal street gang, that defendant was an active participant, and based on his participation, he knew the members engaged in criminal activity. The parties then addressed whether the current crime had to be gang related in order to qualify under section 186.22, subdivision (a). The People argued, citing to *People v. Albillar* (2010) 51 Cal.4th 47, that an active gang member need only commit a crime and it did not have to be gang related. Defendant's counsel argued that *Albillar* was distinguishable because in that case several gang members were together at the time the current crime was committed. The trial court then summarized *Albillar* and found a gang member who is committing a felony is subject to section 186.22(a). The trial court found the preliminary hearing testimony supported that

12

defendant armed himself with a handgun and went to the party. A gang member would arm himself for a confrontation. The section 995 motion was denied.

Defendant brought a section 1118.1 motion to dismiss the gang allegation. The defendant argued that no reasonable jury could rely on the People's evidence to find him guilty. The only evidence of ESS was notations on notebooks found in his room. No contact was shown between defendant and ESS members since 2007. ESS was not named during the incident. Defendant was not an active participant or associate in ESS as of June 11, 2011. The People recounted the evidence supporting the allegation. The trial court found the evidence supported that defendant was a current, active participant in ESS. Defendant's section 1118.1 motion was denied.

The prosecutor began his argument with the following quote from a movie: "'As far back as I can remember I always wanted to be a gangster. To me, being a gangster was better than being president. It meant being a somebody in a neighborhood of nobodies. They weren't like anyone else. They did whatever they wanted. They weren't like anyone else. They did whatever they wanted.'" He then stated that gang members strive for respect and power.

The prosecutor argued that there was substantial evidence that defendant was an active participant in the ESS gang. Defendant showed he still was actively participating in the gang by carrying a loaded firearm in case he was disrespected. No limiting instruction on the use of gang evidence was given to the jury.

13

B.     *Analysis*

At the time of his trial, two published cases held that a violation of section 186.22, subdivision (a) did not require that two gang members act together in committing a crime in order to be convicted under the section.  (See *People v. Sanchez* (2009) 179 Cal.App.4th 1297, 1308 [Fourth Dist., Div. Two] and *People v. Salcido* (2007) 149 Cal.App.4th 356, 368.)

After the trial in this matter, on December 27, 2012, the California Supreme Court decided *Rodriguez*.  In that case, the court noted that one of the elements of a violation of section 186.22(a) is the willful commission of "an act that 'promotes, furthers, or assists in any felonious criminal conduct by members of [the] gang.' (§ 186.22(a).)" (*Rodriguez, supra,* 55 Cal.4th at pp. 1130–1131.)  Our Supreme Court held that this element "requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member.  [Citation.]" (*Id.* at p. 1132.)  The court reasoned that "[t]he Legislature . . . sought to avoid punishing mere gang membership in section 186.22(a) by requiring that a person commit an underlying felony with at least one other gang member." (*Id.* at p. 1134.)  Thus, a gang member does not violate section 186.22(a) if he acts alone in committing an underlying felony.  (*Ibid.*)

Defendant argues that *Rodriguez* makes it clear that the gang evidence should have been excluded because section 186.22, subdivision (a) requires that two gang members act together and there was no evidence defendant worked with anyone else in committing the crime.  However, as set forth *ante*, at the time of his trial, several cases held that a

14

gang member can act alone and be convicted of violating section 186.22, subdivision (a). The trial court could not have anticipated the ruling in *Rodriguez.* As such, even had defendant moved to exclude the gang evidence on this ground by seeking dismissal of the gang allegation, such objection would have been futile. Based on the law at the time, the gang evidence was properly admitted to prove the gang allegation.

Defendant has cited no authority for the proposition that evidence properly admitted at the time of trial becomes a due process violation, if, after the trial is concluded, the count that made such evidence relevant becomes legally untenable. We simply cannot find error on the trial court's part based on these circumstances.

The People argue that even had the gang allegation been excluded, that the gang evidence was admissible to show motive and intent. "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove . . . specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Here, while it appears that some of the gang evidence may have been admissible to prove the remaining crimes, we would be purely speculating as to whether the trial court would have admitted the gang evidence had the gang allegation been dismissed. As such, we only address whether the admission of the gang evidence was prejudicial.

15

We conclude admission of the gang evidence was not prejudicial based on the unique circumstances in this case. There is no reasonable likelihood that a more favorable outcome for defendant would have been reached absent this evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. O'Shell* (2009) 172 Cal.App.4th 1296, 1310, fn. 11 [evidentiary errors reviewed under *Watson*].) To prevail on his argument that he was denied due process of law by the admission of gang evidence, defendant must show that the admission of the evidence was erroneous, and that the error was so prejudicial that it rendered his trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 436, 439.)

It is abundantly clear that defendant was not found guilty of the assault charges based on his gang membership since the jury found him not guilty of being an active participant in a gang. The jury obviously found that defendant shot the gun and rejected that he acted in self defense. Since they found he was not an active gang participant, it cannot be argued that they rejected his self-defense claim because of the gang evidence. The gang evidence all went to whether defendant was an active ESS member. Simply put, once the jury found him not guilty of being an active participant in a gang, the gang evidence simply had no bearing on the jury's decision regarding the assault counts.

Moreover, the evidence supporting defendant's guilt was overwhelming even without the gang evidence. Shawna positively identified defendant as running from the backyard holding a gun. Although she had not seen the shooting, defendant himself confirmed he committed the shooting. There was no dispute that all of the witnesses were injured by fragments from the bullets shot from defendant's gun. The jury was

16

presented with evidence of self-defense and rejected it. Based on the foregoing, there is no reasonable likelihood that a more favorable outcome for defendant would have been reached absent this evidence, and its admission did not render the trial fundamentally unfair.

## IV

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that he received ineffective assistance of counsel due to his counsel's failure to seek to exclude his pretrial statement on the ground that it was obtained due to a promise of leniency and threats by the interrogating officer, e.g., it was not voluntarily made.

Prior to trial, defendant's counsel brought a motion in limine to exclude defendant's pretrial statements, arguing that they were obtained in violation of *Miranda*.[7] Defendant's counsel withdrew the motion as to the failure to give *Miranda* warnings prior to the trial. The transcript of the interview showed that the warnings were given. No other grounds for exclusion were given, and as outlined, *ante*, defendant's statement, including that he admitted he was the shooter, were admitted at trial.

To establish ineffective assistance of counsel, defendant must show that (1) his counsel's representation fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that defendant would have obtained a

---

[7] *Miranda v. Arizona* (1966) 384 U.S. 436.

17

more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 215–218.)

A claim of ineffective assistance of counsel on direct appeal must be rejected if "'"'the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. . . .'"'" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

"If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] When, however, the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. To engage in such speculations would involve the reviewing court '"in the perilous process of second-guessing."' [Citation.] Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal. [Citation .]" (*People v. Diaz* (1992) 3 Cal.4th 495, 557-558.) Ineffective assistance of counsel cannot be predicated on counsel's reasonable, albeit unsuccessful, tactical choices. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1080-1082.)

Whether or not defendant's statement was voluntarily made, we agree with the People that the statement clearly helped defendant establish his self-defense claim. Defendant was identified by Shawna as having a gun that night. It certainly would be reasonable for the jury to conclude that defendant was the shooter based on this

18

testimony. Defendant's counsel reasonably could have considered that self defense would be a more viable defense than an identity defense. Although defendant admitted shooting the gun, he told Detective Juarez he did so because the two men got in his face. Although defendant talked about being disrespected, Tristana corroborated that the two men were coming toward defendant when he shot the gun. The prosecutor in closing argument described the statement as self-serving. Based on the foregoing, we conclude the record supports a reasonable tactical decision existed to allow in the statement as it could be helpful to defendant's self-defense claim. That the decision was ultimately unsuccessful does not entitle defendant to relief. (*People v. Mitcham, supra,* 1 Cal.4th at pp. 1080-1082.)

Moreover, defendant cannot establish prejudice. As noted, Shawna identified him as running from the backyard carrying a handgun. The jury could reasonably deduce he was the shooter. Defendant's statement provided the only viable defense. Defendant cannot show he received ineffective assistance of counsel.

V

SUFFICIENT EVIDENCE OF ASSAULT WITH A SEMIAUTOMATIC FIREARM

Defendant contends that there was insufficient evidence presented that he had the intent to commit assault with a semiautomatic firearm because he shot his gun into the ground and was unaware that it would ricochet or fragment and hit other partygoers.

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable

19

trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

Section 245, subdivision (b), makes it a crime to commit an assault with a semiautomatic firearm. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.)

"Assault with a deadly weapon requires proof of an intentional act committed with knowledge of facts that would lead a reasonable person to realize that physical force would be applied to another as a direct and probable consequence of that act. [Citation.] There is no requirement that the actor intend or be subjectively aware of the prospect of such a consequence. [Citation.]" (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1183, citing to *People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*).)

20

"[T]he test is whether an objectively reasonable person with knowledge of these facts would appreciate that . . . a battery, would directly and probably result from his actions." (*People v. Aznavoleh, supra,* 210 Cal.App.4th at p. 1189.) "[T]he gravamen of assault is the *likelihood* that the defendant's action will result in a violent injury to another [citation], it follows that a victim of assault is one for whom such an injury was likely." (*People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1355.)

"[A] defendant who assaults one person will be liable for assaulting others who are 'reasonably foreseeable.' [Citations.] . . . '[N]o subjective intent to injure a particular victim is required. Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable.' [Citation.]" (*People v. Trujillo, supra,* 181 Cal.App.4th at p. 1353.)

Here, the facts known to defendant were that he had a loaded, semi-automatic firearm. He shot into the ground, which was a cement patio area. Several witnesses stated that there were 30 to 50 people at the party and that many were on the cement patio that was the dance floor. "[A] reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery". (*Williams, supra,* 26 Cal.4th at p. 788, fn. 3.) A reasonable person would realize that shooting a semiautomatic firearm into cement would cause the bullet to ricochet or shatter and that people around where the shot was fired could be hit by fragments.

Defendant contends that he had to have actual knowledge that the bullets hitting the cement would ricochet or fragment. We disagree that he must possess such knowledge. In *Williams,* the court noted that "[A] defendant who honestly believes that

21

his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Williams, supra,* 26 Cal.4th at p. 788, fn. 3.) Even if defendant was unaware of the possibility of ricochet or fragments, he was aware that he shot his firearm into the cement with a crowd of people. Defendant believed that by shooting into the ground he would scare away the men bothering Tristana. However, a reasonable person would be aware that firing at close range into a cement patio could cause the fragments or bullet to hit another.

Defendant appears to argue that only an expert in firearms would be aware that shooting into the cement patio would cause the bullets to ricochet or fragment. However, a reasonable person would not necessarily have to know that the bullet would fragment upon hitting the cement, although most persons would possess that knowledge. It was also possible the kickback from the gun could have caused defendant to lift up the gun and directly hit another partygoer with a bullet. All that was required was that a reasonable person would know that shooting a gun into the ground, in close proximity to 40 to 50 people, could possibly result in a violent injury to someone.

Defendant also points to statements made by the trial court at the time of sentencing to support his claim. The trial court stated that defendant did not willfully intend to injury anyone. The trial court noted, "[t]his is a person that hasn't even completed high school - - his last year of education is the 11th grade - - has no meaningful work and, in essence, little life experience and probably doesn't even foresee in any way that, once you shoot to the ground, bullets are going to go flying all over the

place. Most people with maturity and reason would and would understand that, but I really don't think that's the case here." However, the trial court noted that by discharging the firearm, he was responsible for what happened after that. Under *Williams*, this was enough to support his conviction for assault with a semiautomatic firearm.

Based on the foregoing, substantial evidence was presented to support his convictions of assault with a semiautomatic firearm.

## VI

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

23