Filed 8/26/25  Board of Trustees of California State University v. D.S. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.S., <br><br> Defendant and Appellant. | C100001 <br><br> (Super. Ct. No.  23CV00325) |

Respondent and appellant D.S., a former tenured biology professor at California State University, Chico (CSU or university), appeals from a workplace violence restraining order (WVRO) imposed against him under the Workplace Violence Safety Act.  (Code Civ. Proc., § 527.8.)[1]  On appeal, D.S. contends the restraining order must be

_____

[1]  Further undesignated statutory references are to the Code of Civil Procedure.

1

reversed because it is not supported by substantial evidence. We disagree and affirm the order.

## FACTS AND PROCEEDINGS

We only summarize the pertinent facts. Because this case involves a substantial evidence challenge, we recite the facts in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all factual conflicts in support of the trial court's findings of fact, which are liberally construed to support the challenged order. (See *City of Los Angeles v. Herman* (2020) 54 Cal.App.5th 97, 102; *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94.)

*D.S. and the University Biology Department*

In 2014, D.S. began working as an assistant professor at CSU, and became a tenured professor in 2016. He worked with professors K.G. and E.F. and lab manager and lecturer B.T. in the Biological Sciences Department. D.S.'s office was next to K.G.'s and E.F.'s, and about 30 yards from B.T.'s. D.S.'s relationship with K.G., E.F., and B.T. was collegial from 2014 to approximately March 2020. D.S. was not friends with K.G. or E.F. outside of work but socialized with them at events and had a "close work friendship" with B.T.

In 2020, D.S. was a "senior professor" who served on several committees that had authority over K.G. and E.F., including the committee that determined whether they would be promoted. D.S. also had seniority over K.G. in "the administrative capacity," and served as an informal mentor to her.

*Reports of D.S.'s Sexual Relationship with a Student*

Beginning in December 2019, K.G. suspected that D.S. was engaging in inappropriate behavior with a female student.

While the CSU campus was locked down due to the COVID-19 pandemic in spring 2020, K.G. and D.S. were authorized to be on campus. K.G. observed that D.S. was regularly on campus with the student, and they "started having sex in their office and

2

it was quite loud." During the COVID-19 lockdown from March through June 2020, D.S. began camping in his office with his students and drinking alcohol with them.[2] There was also an incident in which D.S. was "ranting" in the hallway while holding a beer. D.S., who was "in his boxers and socks," was waving his hands and saying: "Fuck everything. Nothing matters." At the time of this incident, the trash can in D.S.'s office was overflowing with empty beer cans. In K.G.'s view, D.S. became "completely unhinged" during lockdown.

In March 2020, D.S. told K.G. that he had purchased a handgun, which seemed "bizarre" to her. D.S. had never owned a gun before, had never been hunting, and had never talked about obtaining a gun for home protection. In April, D.S. purchased ammunition.

E.F. also observed D.S.'s inappropriate conduct with the student. At the end of May 2020, E.F. saw D.S. sitting in his socks and drinking alcohol with a female student, and the room "smelled like sex." E.F. spoke to K.G. about what she had witnessed, and learned that K.G. had seen D.S. on a date with the student on Valentine's Day. E.F. spoke to a male colleague, G.W., about what she had observed. G.W. spoke with D.S., but he denied what E.F. alleged had occurred. D.S. then met with E.F. and discouraged her from reporting his conduct, saying that it would ruin the student as well as his relationship with his wife.

In June 2020, E.F. reported D.S.'s conduct with the student to the university's Title IX office.[3] At the time of the report, E.F. was concerned about the "backlash" she

---

[2] K.G. observed that the futon in D.S.'s office was regularly "pulled out," which indicated to her that he was "camping" in his office.

[3] Title IX refers to Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.). (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1215, fn. 2.) The statutory scheme "require[s] universities to investigate allegations of sexual misconduct involving students." (*Ibid.*)

would receive from D.S., both professionally and personally. She was also afraid for her safety because K.G. had told her that D.S. had "purchased weapons." Although E.F. encouraged K.G. to independently report D.S.'s conduct with the student, K.G. declined to do so because she was concerned that he would shoot her.

In July 2020, the university initiated an investigation regarding the allegation that D.S. was having a consensual sexual relationship with the student. D.S. was temporarily suspended from campus during the investigation, and the investigation resulted in the temporary loss of federal grant funding for D.S.'s research projects.

*D.S. Fixated on K.G. and E.F.*

M.K., D.S.'s estranged wife, testified at trial that D.S. was abusive toward her prior to the onset of the COVID-19 pandemic, but his abusive behavior and drinking became progressively worse during lockdown. D.S. told her that he was being investigated for a COVID lockdown violation, and that people were conspiring against him. D.S. was fixated on K.G. and E.F. for reporting what M.K. believed was the lockdown violation; he would call them "bitches" and ranted about them throughout summer and fall 2020. During the investigation, D.S. told M.K. that if K.G. and E.F. were on fire he "wouldn't piss on them to put [it] out," and that he "wanted to run [K.G.] over" with his truck while she was riding her bicycle.

B.T. testified at trial that she was off campus from March through July 2020. After returning to campus, D.S. confided to B.T. that he was being investigated because K.G. and E.F. had accused him of having an affair with the student. D.S. told B.T. that he was angry, and he acted angry. He referred to E.F. and K.G. as " 'those fucking bitches,' " and said that the professors did not "know who they were dealing with," they had crossed him, "he never forgives and never forgets," and "they were enemies for life now essentially." D.S. told B.T. that he hated K.G. and E.F. and wanted to get revenge. Although he had been warned against retaliating, D.S. said he would try to find ways to intimidate K.G. and E.F. that could not be documented. For example, he would go into

4

K.G.'s lab to intimidate her. B.T. observed that he would glare at K.G. in a hostile manner. K.G. described his behavior as communicating "very pure hatred," and E.F. characterized D.S.'s demeanor at the time as "cold anger." B.T. did not confront D.S. about the fact that he was speaking to her about a confidential investigation because she felt he "was becoming very unstable, and his anger and aggression and everything was just over the top."

B.T. testified that although D.S. repeatedly denied that he was having an affair with the student, she believed he was. B.T. suggested that D.S. back off with the student, apologize and admit to the affair, and try to put it behind him. D.S. did not follow B.T.'s advice and told her he was not going to back off.

The university completed its Title IX investigation on September 14, 2020, issuing a report finding that D.S. had violated university policy by engaging in an inappropriate consensual relationship with a student. As a consequence, D.S. was suspended for the remainder of the fall semester and was not allowed on campus, which resulted in a temporary pay cut. The results of the Title IX investigation made D.S. furious; he constantly talked about hating people in a loud voice, with a focus on K.G. and E.F.

On September 21, D.S. appealed the university's Title IX decision. On September 26, he purchased ammunition, and two days later he went to a shooting range.

*D.S. Reprimanded for Breaching COVID-19 Protocols*

In early October 2020, the university reprimanded D.S. following its finding that he had breached COVID-19 health and safety protocols by hosting students in his office "at various times in May and June."

D.S. scheduled a remote meeting for October 14 with a representative of his union and the faculty rights chair of the university's chapter of the California Faculty Association. Two days before the meeting, D.S. picked up a 12-gauge shotgun that D.S. testified had been on backorder since March.

During the meeting, K.G. could hear D.S. yelling in a loud, angry voice. She heard the Title IX investigator's name mentioned, and therefore she assumed the conversation was about that investigation. K.G. had already felt that D.S. was holding her responsible for his being disciplined.

The day after the meeting, D.S. purchased two boxes of hollow-point bullets for his handgun; D.S. testified that he believed each box contained 50 bullets.[4]

On that same day, D.S. learned that his appeal of the findings from the Title IX investigation had been denied, which made him furious because, in his view, K.G. and E.F. had falsely accused him of having an inappropriate relationship with the student.

In November 2020, K.G. moved to a different office in the biology department that was farther away from D.S.'s office, which she thought might facilitate the healing process with him. At this point, K.G. was "very afraid of professional retaliation" from D.S.

D.S. and the Board of Trustees of California State University (Board) reached a settlement agreement as to the Title IX investigation in December 2020. Around that same time, E.F. moved to a different office in the biology department that was farther away from D.S.'s office.

In January 2021, D.S. returned to the university campus for the spring semester.

*D.S. Told M.K. that He Had Intended to Kill His Coworkers*

From fall 2020 through spring 2021, M.K.'s and D.S.'s relationship continued to deteriorate; they fought almost daily, he was increasingly absent from home, he did not want to participate in raising their children, and he drank heavily almost every day. D.S. told M.K. that during summer 2020 he had purchased a semiautomatic shotgun, a

---

[4] A hollow point bullet is designed to mushroom and expand upon hitting a target to "cause maximum damage" to the target.

handgun, and bird shot and buckshot ammunition. D.S. told M.K. about dreams he had in which he shot himself, and woke up thinking he was covered in blood.

In May 2021, M.K. learned of D.S.'s sexual relationship with the student. Following their final joint counseling session, M.K. was upset and emotional, and asked D.S. what was really going on. M.K. recalled that D.S. replied, " 'I didn't buy guns for home protection. I was planning on shooting my co-workers and shooting myself.' " D.S. added that he had purchased the hollow-point bullets to inflict maximum damage, and he knew how to shoot the guns because he went to the shooting range. M.K. was crying, and sat on D.S.'s lap. She apologized that everything had become so bad, and urged him to get help. She asked him if he was okay, and he became defensive and replied, " 'Well, I didn't do it, did I?' " M.K. replied, " 'Well, that doesn't mean anything.' " M.K. became more scared, and did not know what to do. D.S. did not name E.F. and K.G. as the coworkers he had intended to shoot, but M.K. understood them to be the targets because he had been angry with them since their initial report. D.S. did not indicate that he was discussing a dream, but rather was "clearly confessing ideas and plans that he had in the statements," and M.K. interpreted them as "a cry for help." M.K. did not tell E.F. or K.G. because she was distraught and did not know what to do.

In July 2021, M.K. initiated divorce proceedings against D.S. and requested sole custody of their two young children. This made D.S. "extremely upset" and very angry. Thereafter, D.S. drank "heavily," made violent threats to M.K., and engaged in "threatening" conduct toward her and her family. For example, D.S. sent M.K. a text message that read: "You've made me your enemy. I used to love you, too, but I do not anymore. You and your family are dead to me." In another text message, D.S. told M.K. that he was going to hire the most aggressive "men's rights attorney" and make sure that she "[paid] for all of this," both "literally and figuratively." In a subsequent text, D.S. warned M.K. that he "never" forgives or forgets, and that he has a "long memory when it comes to people that turn on [him]." This made M.K. "extremely scared . . . and worried

that [D.S.] was going to hurt [her] and [her] family." Around this same time, D.S. made multiple threats toward M.K. and her family. He also called M.K. names such as "cunt" and "bitch" and warned her that, "You've fucked with the wrong person and . . . now you're going to get it."

As a result of D.S.'s behavior, M.K. requested a domestic violence restraining order (DVRO) in late July 2021, which was granted shortly thereafter. In her declaration in support of the DVRO, she recounted the conversation in which D.S. stated his intent to kill E.F. and K.G. She also stated that D.S. had become extremely angry and ruminated on E.F.'s and K.G.'s report of his behavior for weeks and weeks. E.F. and K.G. were the main targets of his aggression, and he continually talked about how furious he was with them. He had become increasingly hostile to his colleagues, the chair of the department, and the Dean.

In early August 2021, M.K. reported D.S.'s threatening behavior to law enforcement. Around this time, M.K.'s divorce lawyer provided K.G. and E.F. documents related to M.K.'s request for a DVRO against D.S. Among these documents was M.K.'s declaration describing D.S.'s behavior, including his admission that he bought guns to shoot his coworkers and then himself. Due to his "hostile behavior" toward her, K.G. was "very alarm[ed]" because D.S.'s "plans seemed very real." E.F., for her part, believed that D.S. was capable of carrying out his threats, including his threat to kill her and K.G. B.T. agreed with her colleagues, as it was clear to her that D.S. was "unraveling" and his "agitation and anger were so high." When B.T. read M.K.'s declaration, she was terrified because she found that it "lined up so perfectly with all the things that [D.S.] had been describing that had been going on in his life with his frustrations, and [she] just found it to be so credible that he did make those statements about killing [K.G. and E.F.]." K.G. had a similar reaction, explaining that M.K.'s description of D.S.'s conduct was credible because she was unaware of what K.G. had been experiencing at work from D.S., and M.K. had identified certain points in time

8

when D.S. was behaving angrily towards his coworkers at home "when he was also being hostile with his hate stares" at work. According to K.G., the timing of events described by M.K. (including D.S.'s admission that he intended to kill K.G. and E.F.) coincided with the "peak" of D.S.'s "hostile behavior" at work.

*The University Suspended D.S. to Conduct a Threat Assessment*

In August 2021, after learning of D.S.'s threat to E.F. and K.G. from M.K.'s DVRO petition, the university temporarily suspended D.S. with pay to perform a threat assessment. The threat assessment report included information from only M.K. and rebutted by D.S. The report did not reach a definitive conclusion; it noted a conflict between M.K.'s statements and D.S.'s denials, and the existence of both risk factors for violence and protective factors reducing the risk of violence.

In October, D.S. returned to campus. He sought out B.T. and asked if she was available for a walk. He vented about his situation and exhibited anger and frustration. He indicated that he did not understand why everyone was afraid of him, and then told B.T., " 'I'm a doer. If I wanted all of you dead, you'd be dead.' " D.S. then said, " 'Well, I might skip your office. We'll see.' " D.S. then laughed as if it were a joke, but B.T. did not think it was funny and felt scared. B.T.'s husband advised her to stay away from D.S. to keep herself safe.

The next day, D.S. approached B.T. to get coffee. She told him that she had tried to be supportive of him, but she could no longer be involved and did not want to be his confidant anymore. D.S. responded that B.T. "better not become part of the problem or [she] would regret it." B.T. was frightened and ran up the stairs to a friend; she told the friend that D.S. had made threatening comments to her, and she was afraid of him. Thereafter, D.S. would glare at her and treat her like he had treated E.F. and K.G.

In January 2022, B.T. told the dean of the university what D.S. had said when he returned to campus in October 2021. In spring 2022, D.S. "boasted" to his students

during class that he could do whatever he wanted and not get fired because he had been promoted to full professor.

In June 2022, D.S. sent an e-mail to the university's associate vice president complaining about how G.W. was harassing him. At the time this e-mail was sent, D.S. knew that G.W. had participated in the Title IX investigation, and D.S. suspected that G.W. was currently spreading rumors about him being dangerous in an effort to get him fired. In the e-mail, D.S. referenced recent mass shootings in Texas and New York. As relevant here, the e-mail stated: "I want to make sure that others in the future are not subjected to this kind of treatment and that our workplace remains safe and hospitable for all; this is the key to a functioning academic environment. As we've all seen in the news recently in Uvalde[, Texas,] and Buffalo, [New York,] harassment and threats can reach a violent crescendo. [G.W.] has been creating a hostile work environment for me . . . and is unrepentant. I pray that nothing else negative arises from his harassment and threats towards me." After learning about this e-mail, the President of the Chico Chapter of the California Faculty Association urged the university to take action to ensure campus safety.

*Article Published and D.S. Suspended Again*

In December 2022, a third-party online publisher published the first in a series of articles about D.S., his relationship with the student, the subsequent threats to employees, and the university's investigations. D.S. was suspended again; he remained suspended into 2023.

The articles raised significant concern about D.S. in the university community, and his "professor of the year" award was revoked. At a Zoom meeting with members of the biology department about the articles, including his alleged threat to kill K.G. and E.F., D.S. claimed that M.K. was trying to win a custody battle with him, and that he never said that he wanted to kill K.G. and E.F. D.S. explained that he had a dream wherein he killed them. When a faculty member explained that she had a scary dream that students

10

were wearing bullet-proof vests, D.S. was dismissive and made light of the situation by saying: "That was very clever. Thank you for your contribution." D.S. later apologized for making a "sarcastic" comment, explaining that he thought the faculty member was trying to make fun of him by making a joke. He also admitted that the articles were a "blow" to his self-esteem and made him feel upset, saddened, and disappointed.

A few days after the Zoom meeting, the university held a campus-wide forum that was attended by 600 to 900 people. Students and faculty members expressed outrage at D.S.'s conduct and the lack of action on the part of the university to protect its students. The Chico State Academic Senate voted in favor of terminating D.S., and urged the university to pursue a restraining order against him.

In February 2023, D.S. filed civil lawsuits against M.K. and B.T., both of which alleged defamation and other claims, including intentional infliction of emotional distress.

*Board's Request for a WVRO*

On February 8, 2023, the Board filed a petition for a WVRO under section 527.8 against D.S., which sought an injunction prohibiting violence or a threat of violence against various individuals, including K.G., E.F., and B.T. The petition alleged that D.S. made a credible threat of violence by making knowing or willful statements or engaging in conduct that would place a reasonable person in fear of her safety. The petition recounted D.S.'s purchase of firearms and ammunition, threats to kill E.F. and K.G., and statements to B.T. and M.K. The petition alleged that the risk of violence posed by D.S. had increased after the events had been publicized in December 2022, D.S. was placed on administrative leave, and D.S. had threatened B.T. with legal action after she recounted his statements to her at the forum regarding his conduct. The petition also alleged that irreparable harm would result if the restraining order were denied, asserting a reasonable probability that D.S.'s anger, hostility, and threats toward university faculty, staff, and

11

students would increase.  The Board requested both temporary and permanent injunctive relief.

The trial court issued a temporary restraining order (TRO), with which D.S. was served on February 10, 2023.  Days later, D.S. violated the TRO by contacting B.T. via e-mail.  D.S. testified at trial that he inadvertently e-mailed B.T. when he was intending to forward e-mails to his attorney.[5]

The hearing on the Board's petition was held over five days from April through July 2023.

*Trial Court Order*

In September 2023, the trial court issued a statement of decision and judgment granting the request for a WVRO.  The court concluded that D.S. made a credible threat of violence against K.G. and E.F., which reasonably could be construed to be carried out at the university campus.  The court further found in its discretion that protection of B.T., members of B.T.'s and E.F.'s families, and the entire university community was warranted given the nature of D.S.'s threats.

The trial court rejected D.S.'s arguments that a restraining order should not issue because the university had previously allowed him to return to campus, and that the petition was filed in response to the articles published about D.S.'s behavior and the ensuing investigation.  The court noted that a restraining order shall issue if the court finds there has been a credible threat of violence that could be carried out at the workplace, and found that a restraining order was necessary, warranted, and justified based on D.S.'s conduct.

---

[5]  As we discuss *post*, the trial court found that D.S. was not a credible witness.

The trial court noted that D.S. testified at length at the trial, but found him to not be a credible witness, including his testimony that he never made threatening statements, and that he purchased guns and ammunition in 2020 for home protection.

Additionally, the trial court observed, "each of the named protected parties have testified as to their ongoing fear, anxiety, paranoia, and debilitating stress resulting from [D.S.'s] threats and conduct over the past three years. Their testimony includes feeling compelled to move offices to avoid interacting with [D.S.], feeling targeted by [D.S.], feeling compelled to obtain a security camera for their personal protection at home, carrying a rock with them for protection, deliberately staying home from work to avoid confrontation with [D.S.], attending counseling for feelings of terror and fear, and even considering ways to remain out of the country to avoid [D.S.] at all costs."

The trial court took judicial notice of the defamation lawsuit D.S. filed against M.K. and B.T., and observed that in August 2023, D.S. dismissed the case against M.K., and B.T. prevailed on her special motion to strike all claims against her.

D.S. timely filed notice of appeal. The case was fully briefed in February 2025 and was assigned to the current panel in April.

## DISCUSSION

D.S. contends the WVRO must be reversed for lack of substantial evidence that he made a credible threat of workplace violence and that, at the time the petition was filed, there was a reasonable probability of an employee suffering great or irreparable harm if the court did not grant the petition. We disagree.

### I

*Section 527.8 and Standard of Review*

Under section 527.8 as it was in effect at the time of the hearing, an "employer, whose employee has suffered . . . a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a [WVRO] after hearing on behalf of the employee and, at the

13

discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer." (Former § 527.8, subd. (a), eff. Jan. 1, 2016 (Stats. 2015, ch. 411, § 2).) A "credible threat of violence" is "a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (*Id.*, subd. (b)(2).) A "course of conduct" is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose . . . ." (*Id.*, subd. (b)(1).)

To obtain a WVRO, the employer " 'must establish by clear and convincing evidence not only that [the individual] engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future.' " (*CSV Hospitality Management LLC v. Lucas* (2022) 84 Cal.App.5th 117, 122-123; see also *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 537-538 (*Garbett*).) "[T]he determination of whether it is reasonably probable an unlawful act will be repeated in the future rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 335, fn. 9; see *Garbett*, at p. 542 [" ' "[C]ontext is critical in a true threats case and history can give meaning to the medium" ' "].) " '[T]he requirement of establishing the reasonable probability wrongful acts, or simply unlawful violence, will occur in the future guarantees that injunctive relief will be issued to prevent future harm instead of punishing past completed acts.' " (*CSV Hospitality Management LLC*, at p. 123; see also *Scripps*, at p. 332 [injunctive relief is only available to prevent threatened injury and has no application to completed wrongs; it should not be ordered absent evidence establishing the reasonable probability the threatened acts will occur in the future].)

14

"[W]e review an injunction issued under section 527.8 to determine whether the necessary factual findings are supported by substantial evidence. [Citation.] Accordingly, we resolve all factual conflicts and questions of credibility in favor of the prevailing party, and draw all reasonable inferences in support of the trial court's findings." (*Garbett*, *supra*, 190 Cal.App.4th at p. 538.) Where, as here, we review whether a fact has been proved by clear and convincing evidence, the issue is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) Here, the test of a credible threat is whether the trial court could find a high probability that a reasonable person would perceive such a threat in the manner in which D.S. comported himself. (*Garbett*, at p. 539.)

II

*Credible Threat of Violence*

D.S. contends substantial evidence does not support the finding that he made a credible threat of violence. After considering all the relevant facts in the light most favorable to the Board, we are not persuaded. As we now explain, substantial evidence supports the trial court's finding that it was highly probable D.S.'s conduct placed a reasonable person in fear for her safety, and D.S.'s conduct served no legitimate purpose.

In spring 2020, D.S. was camping, drinking alcohol with students, and having sex with the student in his office on campus. K.G. recalled that D.S. was acting "completely unhinged." D.S. told K.G. that he purchased a handgun, which K.G. found "bizarre." D.S. also purchased a semiautomatic shotgun. Before 2020, D.S. had never owned guns or expressed any concern about needing guns for home protection. In April 2020, he purchased $86 in ammunition.

After E.F. and K.G. participated in the investigation into D.S.'s relationship with the student, D.S. told B.T. that he was angry, and referred to E.F. and K.G. as " 'those fucking bitches.' " He told B.T. that E.F. and K.G. had crossed him, they did not know

15

who they were dealing with, he "never forgives and never forgets," he hated them and wanted to get revenge, and they were "enemies for life." B.T. characterized D.S.'s anger and aggression as "over the top," and she believed he was becoming "very unstable." B.T. added that D.S would find ways to intimidate K.G. and E.F. in ways that could not be documented. M.K. testified that D.S. believed his colleagues were conspiring against him, and had fixated on E.F. and K.G., referring to them as "bitches." In her July 2021 declaration in support of a DVRO, M.K. declared that D.S. had become extremely angry, that E.F. and K.G. were the main targets of his aggression, and that he continually talked about how furious he was with them and had ruminated on E.F.'s and K.G.'s report of his behavior for weeks and weeks.

In September 2020, he bought $148 in ammunition and went to a shooting range. On October 12, he picked up a Kel-Tek KS7 shotgun, which had been on backorder since March. On October 15, the day after he had been in a heated meeting about the Title IX investigation, he purchased 50 hollow-point bullets. He also had dreams or "visions" about shooting himself and waking up covered in blood.

In May 2021, D.S. admitted to M.K. that he had not purchased the guns and ammunition for home protection, but rather for the purpose of shooting his coworkers and then himself. He further admitted that he had gone to the shooting range to learn how to shoot the guns. M.K. asked him, " 'What about now,' " and " 'are you okay?' " D.S. became defensive and responded, " 'Well, I didn't do it, did I?' " M.K. did not continue the conversation for fear that pressing him on the subject would "trigger him in some sort of way." She testified that D.S. did not indicate that he was discussing a dream, but rather was "clearly confessing ideas and plans that he had in the statements." Although D.S.'s answer to M.K.'s question stated the obvious--he had not yet carried out a violent act against K.G. and E.F.--he did not expressly deny that he continued to intend to carry out an act of violence against the professors.

16

When M.K. initiated divorce proceedings in July 2021, D.S. was extremely upset and angry; he continued to drink "heavily" and engaged in threatening conduct towards M.K. and her family. Among other things, D.S. told M.K. that she "fucked with the wrong person," that she would "pay" for her behavior, and that he "never" forgives or forgets and that he has a "long memory when it comes to people that turn on [him]."

In October 2021, after D.S. returned to campus following his suspension, he told B.T., " 'I'm a doer. If I wanted all of you dead, you'd be dead.' " D.S. then said, " 'Well, I might skip your office. We'll see.' " While D.S. laughed as if it were a joke, B.T. did not think it was funny, and she felt scared.

In June 2022, D.S. sent an e-mail to the associate vice president of the university complaining that G.W. was harassing him, which included spreading rumors about D.S. being dangerous in an effort to get him fired. As part of this e-mail, D.S. referenced two recent mass shootings that occurred in New York and Texas in May 2022, warned that "harassment and threats can reach a violent crescendo," and "pray[ed] that nothing else negative arises from [the] harassment and threats [directed] towards [him]."

Around the same time that the Board petitioned for a WVRO in February 2023, D.S. filed civil lawsuits against M.K. and B.T., both of which alleged defamation and intentional infliction of emotional distress.

Viewing the record in the light most favorable to the Board, there is substantial evidence that D.S. made a credible threat of violence towards K.G. and E.F. that could be reasonably construed to be carried out in the workplace. The record reflects that D.S. engaged in a course of conduct that showed he had a continued purpose to exact revenge against K.G. and E.F. (his "enemies for life"), including intimidation at work, threats of physical violence, the purchase of guns and ammunition, including hollow-point bullets, and training on how to use them. At no point did D.S. apologize or otherwise take any responsibility or accountability for his aggressive and hostile behavior. Instead, with one

17

exception,[6] D.S. consistently denied any wrongdoing and filed defamation lawsuits against M.K. and B.T. based on his persistent belief that he had done nothing wrong and that they (and others) were attempting to destroy his career by making false accusations against him. At the restraining order hearing, D.S. claimed that he purchased the guns in spring 2020 for home protection, and that he only had a dream of shooting his coworkers. In other words, D.S. took the position that M.K. lied when she said he admitted to purchasing guns to shoot and kill his coworkers. The trial court, however, found that D.S. was not a credible witness. By contrast, the trial court found that K.G., E.F., and B.T. were credible witnesses.[7] In the court's view, they provided "compelling" testimony "as to their ongoing fear, anxiety, paranoia, and debilitating stress resulting from [D.S.'s] threats and conduct over the past three years." We must defer to these credibility determinations (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011), which are amply supported by the evidence in the record.

We further conclude that D.S.'s course of conduct served no legitimate purpose. D.S. argues that his statement to M.K. that he intended to kill his coworkers and then himself occurred after an emotional therapy session, and there was a legitimate purpose in discussing what was happening in his life with his wife. Similarly, he argues that his statements to B.T. that he might skip her office if he committed a mass shooting had the legitimate purpose of an attempt at dark humor. We disagree. There was no legitimate

---

[6] D.S. admitted that he violated COVID-19 social distancing protocols by meeting with students in his office during the lockdown in 2020.

[7] D.S. argues that because the trial court did not find that he made a credible threat of violence against B.T., the court either based its ruling on D.S.'s statements to M.K., or found B.T. to not be a credible witness. We disagree. The court's finding that D.S. made a credible threat against only K.G. and E.F. only suggests that the court impliedly found that D.S.'s statements to B.T. were too vague to be considered credible threats of violence against B.T. There is nothing to suggest that the trial court disregarded B.T.'s testimony as lacking credibility.

18

purpose to D.S.'s aggressive and hostile course of conduct, his expression of intent to kill E.F. and K.G., his purchase of guns and hollow-point bullets for the express purpose of killing his colleagues, his repeated practice sessions at the shooting range for the purpose of being able to use the guns to kill his colleagues, and his multiple references to mass shootings. D.S.'s conduct and statements had no legitimate purpose other than to put those who received the communications in fear for their safety.

III

*"Knowing" Requirement*

D.S. argues that the requirement within section 527.8, subdivision (b)(2) that a credible threat of violence be a knowing and willful statement requires a real probability that he knew his words or behavior could reasonably be perceived as a serious threat by other people, and argues that substantial evidence does not support such a finding. We disagree that the statute requires a defendant to know that his statements could reasonably be perceived as a threat by others.

In *Garbett*, *supra*, 190 Cal.App.4th at page 538, the court determined that the restrained person's subjective intent was not required for his conduct to be deemed a credible threat. The court observed that the definition of "credible threat" in effect at that time was the product of a 1998 amendment, which had amended out of the statute language from the prior version that had defined a credible threat in part as a statement that was "intended to, and which actually causes, a person to believe that he or she is under threat of death or serious bodily injury." (*Id.* at p. 539, italics omitted.) The court observed that the version of the statute in effect at that time did not require that defendant intend to cause the person to believe that he or she has been threatened with death or serious injury, only that the *statement* be made knowingly and willingly, which would place a reasonable person in fear for his or her safety. (*Ibid.*; see *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1256 [" 'It is not necessary that the defendant intend to, or be able to carry out his

19

threat; the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat' "].)  The court distinguished the statute at issue in *In re M.S.* (1995) 10 Cal.4th 698 at page 713, which prohibited " 'willfully' threatening a person." (*Garbett*, at p. 539, fn. 5.)  In that case, "the court interpreted the statutory language to include a specific intent to interfere with the other person's legally protected rights." (*Ibid.*, citing *In re M.S.*, at p. 713.)

D.S. relies on *People v. Garcia* (2001) 25 Cal.4th 744, 752, in which our Supreme Court concluded that a defendant can only have willfully failed to register as a sex offender (Pen. Code, § 290) where the defendant actually knows about the registration requirement.  But *Garcia* is inapposite because the statute in that case required a willful violation of the statute, whereas here the statute requires only a "knowing and willful *statement*." (Code Civ. Proc., § 527.8, subd. (b)(2), italics added.)

IV

*First Amendment Argument*

D.S. contends substantial evidence does not support the trial court's credible threat finding because his statements constituted speech protected by the First Amendment. D.S. has forfeited this argument.

The right to free speech is not absolute or unlimited. (*Near v. Minnesota* (1931) 283 U.S. 697, 708; *Gerawan Farming v. Lyons* (2000) 24 Cal.4th 468, 486.)  The state may penalize threats provided the relevant statute punishes threats falling outside the scope of First Amendment protection. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134.)  The state has greater latitude to regulate expression that "strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts." (*In re M.S., supra,* 10 Cal.4th at p. 710.)

Recently, the United States Supreme Court recognized that the existence of a true threat depends on what the statement conveys to the person receiving the statement, not the mental state of the author, and therefore the First Amendment does not require

20

specific intent for a statement to be a true threat. (*Counterman v. Colorado* (2023) 600 U.S. 66, 74; *People v. Lowery* (2011) 52 Cal.4th 419, 426-427 [to be constitutional, a statute criminally punishing threats need not include an element of specific intent].) However, the court in *Counterman* concluded that the First Amendment may still demand a subjective mental-state requirement to shield some true threats from liability in order to avoid unnecessarily chilling speech. (*Counterman*, at p. 75.) The court concluded that the appropriate *mens rea* in this context is recklessness, or a showing that a person " 'consciously disregard[ed] a substantial [and unjustifiable] risk that [his] conduct will cause harm to another.' " (*Id.* at p. 79.) The court noted that recklessness is "morally culpable conduct, involving a 'deliberate decision to endanger another,' " and in the threats context requires that the speaker "is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.' " (*Ibid.*) The court distinguished recklessness from purpose (the defendant " 'consciously desires' a result"), knowledge (the defendant " 'is aware that [a] result is practically certain to follow' "), and negligence (the defendant is not but should be aware of a substantial risk that others will understand his words as threats). (*Ibid*; see also p. 79, fn. 5 & p. 82.)

The Board asserts that D.S. forfeited his First Amendment argument by failing to raise it at trial. Indeed, D.S. acknowledges that he did not raise the argument at trial, although *Counterman* was issued during the trial in this matter.[8] "Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal." (*Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1101; see *San Diego Police Department v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 579 [in context of First Amendment argument raised for the first time on appeal to challenge a

---

[8] Trial was conducted over five days on April 21, May 18, May 19, July 6, and July 7, 2023. *Counterman* was issued June 27, 2023. (*Counterman v. Colorado*, *supra*, 600 U.S. 66.)

Gun Violence Restraining Order]; see also *D.Z. v. L.B.* (2022) 79 Cal.App.5th 625, 633-634 [in context of civil harassment restraining order under section 527.6, restrained party waived procedural due process argument on appeal by failing to raise it at trial].)

Nevertheless, D.S. asserts that his claim is cognizable on appeal because it challenges the sufficiency of the evidence, and therefore cannot be forfeited. (See *People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1350, fn. 3.) We disagree. D.S.'s claim is that his speech was protected under the First Amendment. " '[A]s a general rule, "the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal." [Citation.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.] [¶] The reasons for the rule are these: " 'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.' " ' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 638.) " '[B]y failing to object, the defense [does] not just deny the conscientious trial judge an opportunity to explain his judgment or correct any error. It also deprive[s] reviewing courts of further factual findings that would have helped to explain the trial court's decision.' " (*Id.* at p. 640, quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 18.)

V

*Probability of Future Threat of Violence*

D.S. argues no substantial evidence supports the trial court's implied finding that great or irreparable harm would result without the issuance of the injunction. Again, we disagree.

22

D.S. observes that since 2021, he has had only minimal and incidental contact with his colleagues. K.G.'s last interaction with D.S. was a vague and nonspecific interaction in the laboratory at some point before the December 8, 2022, article publicizing the events, E.F. actively avoided D.S. after returning from her year-long sabbatical in fall 2022, and on December 4, 2022, he and B.T. had discussed his children receiving their COVID-19 vaccinations. He further observes that in December 2022, the university's president stated in that in year since D.S. had returned to work, there had been no safety issues, and as of that time he had not done anything that could be construed as threatening in more than six months. Finally, D.S. notes that at the time the petition was filed in February 2023, he had already been suspended from campus for two months, was prohibited from returning to campus, and it had been 55 days since he had voluntarily relinquished his firearms to law enforcement. He argues that at the time of the hearing, there was no likelihood of further interaction with the protected parties.

D.S.'s arguments do not account for the standard of review on appeal, which requires that "we resolve all factual conflicts and questions of credibility in favor of the prevailing party." (*Garbett*, *supra*, 190 Cal.App.4th at p. 538.) Viewing the evidence in the light most favorable to the prevailing party, the evidence supported the trial court's finding that D.S. posed a credible threat of violence in the future.

D.S. was vindictive and exhibited anger toward K.G. and E.F. He stated that he "never forgives and never forgets," referred to K.G. and E.F. as his "enemies for life," and said that he wanted revenge against them. He fixated on K.G. and E.F., referred to them as "those fucking bitches," and took actions specifically intended to intimidate them. In May 2021, D.S. told M.K. that he had harbored the intent to kill K.G. and E.F., and when asked whether he continued to harbor that intent, evaded the question and responded only that he had not yet committed an act of violence. In October 2021, he told B.T. that she would regret it if she ever became "part of the problem," and made a statement to her that suggested he was still considering committing a mass shooting. In

23

June 2022, D.S. referenced mass shootings in an e-mail to the university's associate vice president. Finally, at the hearing on the petition, D.S. took no responsibility for his conduct, and instead argued that everyone was lying and that he had made no threatening comments. There is nothing in the record showing that D.S.'s anger and aggression towards K.G. and E.F. dissipated in any meaningful way after he purchased guns and ammunition in spring 2020 for the purpose of shooting and killing his coworkers. Substantial evidence shows that D.S. made credible threats towards K.G. and E.F., continued to hold a grudge against them, and made statements suggesting that he continued to pose a threat of violence at the time of the hearing, which supported the finding that great or irreparable harm would result without the issuance of the injunction.

The fact that D.S. was suspended from campus and had voluntarily relinquished firearms to law enforcement does not change the result. At the time of the restraining order hearing (spring and summer of 2023), D.S. was suspended but still employed by the university. E.F. testified that she remained fearful of D.S. because he had been to her house and knew her routines. K.G. testified that she watched for D.S.'s car when she biked to work. The mere fact that D.S. was temporarily not allowed on campus and did not have access to the firearms he had relinquished to law enforcement does not obviate the need to prohibit D.S. from coming to campus.

D.S. relies on *Scripps Health v. Marin, supra,* 72 Cal.App.4th 324, but that case does not compel a contrary conclusion. In *Scripps,* the defendant, whose mother was a patient at the plaintiff's facility, "pulled [a] door open, striking [the plaintiff's employee] with the door and pushing her into the wall" when that employee blocked the defendant from leaving the room. (*Id.* at p. 328.) In reversing the WVRO, the appellate court found no substantial evidence that the defendant was likely to commit further acts of violence against the plaintiff's employees because by the time of trial, the defendant's mother had switched her health insurance provider so she was unlikely "to return as a patient to" the plaintiff's facility. (*Id.* at p. 336.) As a result, it was unlikely that the defendant "would

24

repeat any violent acts against [the plaintiff's] employees." (*Ibid*.) By contrast, here D.S. was intimately familiar with the CSU campus, and knew K.G. and E.F., had interacted with them socially, and knew their routines. He had expressed that he held a grudge against them for life and blamed them for the Title IX investigation that harmed his standing in the CSU community. Thus, the likelihood that he could and would commit an act of violence against them was far more likely than that in *Scripps*.

Under the circumstances presented and viewing the evidence in the light most favorable to the Board, a reasonable trier of fact could have found that D.S.'s failure or refusal to change his behavior and his unwillingness to accept responsibility for his conduct placed K.G., E.F., and other university employees in danger of future violence.

## DISPOSITION

The judgment is affirmed. The Board shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


                                            /s/
                                       Duarte, J.


We concur:


/s/
Mauro, Acting P. J.


/s/
Krause, J.

25