Filed 3/16/26

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RODNEY HERBERT RIGGS, JR.,<br><br>        Defendant and Appellant. | D085449<br><br><br>(Super. Ct. No. BAF2200857) |

APPEAL from a judgment of the Superior Court of Riverside County, F. Paul Dickerson, Judge.  Affirmed.

Cynthia M. Jones and Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Rodney Herbert Riggs of two counts of assault with a semiautomatic firearm, among other charges.  We affirm.  In the unpublished

_____

*      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Discussion parts I and II.

portion of this opinion, we reject Riggs's first two claims that there was insufficient evidence to establish the knowledge or intent element of the assault with a semiautomatic firearm counts and the trial court erred by declining defense counsel's request for instructions on accident and mistake of law.  In the published portion, we reject Riggs's claim that his trial counsel was ineffective because, during part of the trial, he was temporarily suspended from the California State Bar for purported noncompliance with trust account reporting requirements.

## BACKGROUND

A jury convicted Riggs of two counts of assault with a semiautomatic firearm (Pen. Code,[1] § 245, subd. (b) [counts 1 and 2]); assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1) [count 3]); inflicting traumatic injury on a person with whom he had a current or previous dating relationship (§ 273.5, subd. (a) [count 4]); criminal threats to cause great bodily injury or death (§ 422 [count 5]); possession of a firearm with a prior felony conviction (§ 29800, subd. (a)(1) [count 6]); and possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a) [count 7]).  As to counts 1, 2, and 5, the jury also found true that Riggs personally used a firearm within the meaning of sections 12022.5, subdivision (a), and 1192.7, subdivision (c)(8).  At sentencing, Riggs was sentenced to a term of 25 years and four months.

The trial evidence established the following facts.[2]

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Our summary of the facts reflects the relevant standard of review for Riggs's claim of insufficient evidence.  In reviewing such claims, we examine the record in the light most favorable to the judgment, presuming the existence of every fact in support of the judgment that the jury could reasonably deduce from the evidence.  (*People v. San Nicolas* (2004)

In August 2022, Jane Doe lived with her father Chris (Father), mother Annie (Mother), and two brothers, including Chris (Brother). Jane had been dating John for a few months. At the same time, Riggs, whom she had begun dating two years before, was her ex-boyfriend or boyfriend.[3]

On August 3, 2022, John and Jane rode down the street in front of Jane's house on a four-wheeled motor bike, which was described as a "quad." Jane was sitting behind John.

Meanwhile, Riggs came into Jane's house looking for her. Father and Jane's two brothers were at home. Riggs was angry and "talking shit" about Jane to her brother. Riggs left the house toward the street.

Riggs then saw John and Jane riding the motor bike together. Father, still in his home, heard gunshots outside. At some point, John fled on foot.

Father next heard Riggs and Jane screaming as they approached the house. Both came inside, and Father saw Jane had blood on her face. Riggs grabbed Jane's hair and hit her multiple times. Riggs pointed the gun at Father and Brother and threatened to shoot them.

Brother ran out of the room to hide and called Mother to ask her to call the police. Mother called 911, and the 911 operator called Brother. During the call, Brother sounded scared. Brother reported Riggs was in the house with a gun, breaking things and hitting his sister. Earlier, he heard shots fired outside the house toward the street.

---

34 Cal.4th 614, 657–658 (*San Nicolas*); *People v. Young* (2005) 34 Cal.4th 1149, 1175 (*Young*).)

[3] At the time of trial, Jane testified Riggs was still her boyfriend and he was so on the day of the incident, August 3, 2022. Immediately after the incident, she told police that Riggs was her ex-boyfriend.

3

Riggs called the family "snitches" for calling the police. He then grabbed Jane and pulled her outside the house into the backyard.

When Jane and Riggs were outside, a Riverside County Sheriff's Department helicopter arrived in response to a 911 call reporting a man with a gun. The helicopter's video camera captured Riggs hitting Jane in the abdomen with his hand and then with the handle of a shovel. Sheriff's deputies soon arrived. When they did, Riggs appeared to be lifting the shovel to hit Jane again, but he dropped the shovel on the deputies' orders. Deputies took Riggs into custody. He had a bag of methamphetamine in his shoe.

After the incident, Jane's face was covered in blood and swollen, and she had bruising on her face, scalp, neck, and arm. She was bleeding from her nose and mouth, and she was upset and crying. At the scene, Jane told police her ex-boyfriend, Riggs, hit her with his fist multiple times. She accepted some medical treatment but refused to go to the hospital.

Sheriff's deputies examined the scene. Inside Jane's residence, there was blood on the floor and the furniture. In the backyard, investigators found a semiautomatic firearm in a metal shed near where they contacted Riggs. The firearm was wrapped in a towel that had blood on it. The magazine was empty, and the slide of the gun was locked to the rear of the empty chamber, which indicated all bullets had been fired from the firearm. The firearm was capable of firing only 9-millimeter bullets.

Just north of the front of Jane's home, law enforcement found four spent 9-millimeter cartridge cases. Further north, 75 to 100 yards from the home, they found the motor bike and three additional spent 9-millimeter cartridge cases nearby. The motor bike's engine had been hit by two bullets, leaving one bullet hole and one strike mark.

Riggs had gunshot residue on both hands. His DNA was on the trigger, trigger guard, and slide of the gun found in the metal shed.

Two days later, Jane went to the hospital for her injuries. She was with John. She reported that she was injured falling off a bicycle. Medical professionals found the injuries inconsistent with her story and called law enforcement. When a Sheriff's investigator came to the hospital, Jane was defensive and did not want to talk to him. She refused to let him take pictures of her injuries.

At the time of trial, Riggs was Jane's boyfriend again. Although Jane testified at trial, she was an uncooperative witness for the prosecution and denied her earlier statements to the deputies. She testified that John "tried to . . . hit [Riggs] off the road" with the motor bike and she "flew off the bike" as it "wrecked". She stated the scrapes and bruises on her face came from falling off the motor bike face-first onto dirt and pavement. Jane initially testified Riggs was not angry or upset, and they did not have any physical or verbal altercations that day. But she later admitted he was upset about her being with John and slapped her face.

The jury additionally heard evidence that, during Jane's relationship with Riggs, she asked Mother to come to Riggs's house, including two or three weeks before trial when Jane and Riggs had an argument. And before trial, Mother called the Riverside County District Attorney's Office and stated she was concerned Riggs would kill Jane because of how he acts when they fight.

In closing, Riggs's attorney conceded Riggs was angry that day, fired the shots, brought the gun back into Jane's house and waved it around in the presence of her family, and dragged Jane by the hair and hit her. Counsel argued the evidence did not support the conclusion Riggs shot at Jane and John while they were on the motor bike.

5

## DISCUSSION

### I.

*Substantial Evidence Claim*

Riggs argues the evidence shows only that Riggs fired at the motor bike, but not that he intended or reasonably believed firing those shots would injure Jane or John. We conclude sufficient evidence supports the jury's conviction of Riggs for both counts of assault with a semiautomatic firearm.

In reviewing Riggs's claim of insufficient evidence, "we must 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*San Nicolas, supra*, 34 Cal.4th at pp. 657–658; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Young, supra*, 34 Cal.4th at p. 1175.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 42.) We do not reverse on a claim of insufficient evidence "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 245, subdivision (b), criminalizes an assault committed using a semiautomatic firearm.[4] "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "[A]ssault does not require a specific intent to injure the victim," but "a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*People v. Williams* (2001) 26 Cal.4th 779, 788 (*Williams*).) Firing a warning shot at a vehicle with the knowledge that the victim is in the "near vicinity" is an "act by its nature [that] would directly, naturally and probably result in a battery." (*Id.* at p. 790.) And "displaying a gun and/or firing it in the general direction of others is sufficient to provide the mens rea for an assault charge where there is animus between the defendant and the targeted party and/or the surrounding circumstances are fraught." (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 210 (*Cruz-Partida*).)

Ignoring the totality of the circumstances that transpired on August 3, 2022, Riggs contends the only evidence supporting the assault with a semiautomatic firearm counts is: Father and Brother heard shots from their

---

[4] As to assault with a semiautomatic firearm, the trial court instructed the jury with CALCRIM No. 875: "To prove that the defendant is guilty of this crime, the People must prove that: one, the defendant did an act with a semiautomatic firearm that, by its nature, would directly and probably result in the application of force to a person; two, the defendant did the act willfully; three, when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone; four, when the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person; and five, the defendant did not act in self-defense or in defense of someone else." The court then explained, "Someone commits an act willfully when he or she does it willingly or on purpose."

7

residence; Brother reported Riggs had a firearm; police discovered the firearm, which had been fired, behind the residence; the motor bike had a bullet hole in its engine; and police found bullet casings compatible with the firearm near the motor bike. From this evidence, he concludes the only permissible inference is that he fired the weapon *at the motor bike*, but there was no evidence whether he "intended or to reasonably believed that the shots would injure" Jane or John. We reject this incomplete analysis.

When considering the mens rea for assault, "understanding the context is important." (*Cruz-Partida, supra*, 79 Cal.App.5th at p. 210.) Considering the evidence in the context of the parties' relationships and the events before and after Riggs fired the gun at the occupied motor bike, it was reasonable for the jury to infer that he fired the shots at the motor bike, in the direction of Jane and John, who were on the motor bike. Riggs had been Jane's long-term boyfriend. On August 3, 2022, before firing the shots, he was angry when he arrived at Jane's house; he was "talking shit" about her when he left to go look for her; and he then saw her riding the motor bike with another man. After emptying the gun of bullets, Riggs dragged a bloody Jane into the house with her father and brother present, took her to the backyard, and hit her. Riggs admitted he was angry, fired the shots, waved the gun around in Jane's home, and physically hurt Jane. Based on the reasonable inference that Riggs fired shots at the occupied motor bike, or at a minimum in the very near vicinity of Jane and John, it was proper for the jury to determine that a reasonable person would know that a battery would directly, naturally and probably result. (*People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1354.)

Riggs proposes potential alternative circumstances, including that he might have fired the gun into the air or the ground to scare Jane and John, or he might have shot at the motor bike to vandalize it. But firing the gun "to

8

scare" the victims when they are in the "near vicinity" is no different than firing a warning shot at an occupied vehicle, which has been held to be an "act by its nature [that] would directly, naturally and probably result in a battery." (*Williams, supra*, 26 Cal.4th at p. 790; see also *Cruz-Partida*, 79 Cal.App.5th at p. 211 [finding that an individual pointing a loaded gun and firing a warning shot "in the general vicinity" of the victims while angry was sufficient for the jury to reasonably infer he "acted purposely to frighten the [victims] with physical menace—acts which, by virtue of their nature, contemplate injurious consequences"].) Even under Riggs's alternative interpretation of the evidence, his act of firing shots in the vicinity of the victims with the intention to frighten them suffices to establish the requisite intent for assault.

Regardless, "the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378 [cleaned up].) "Ultimately, it is within the [fact-finder's] exclusive province to determine whether an inference that may be drawn from the evidence is, in fact, the only reasonable one, a determination that depends on its resolution of conflicting evidence and weighing the credibility of witnesses"; permitting the reviewing court to "draw its own inferences and compare them to other possible inferences . . . would have the court resolve conflicts in the evidence and weigh the testimony of witnesses," which " 'would be a clear usurpation of the jury's exclusive function.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 202.) Here, the circumstances as a whole, viewed in the light most favorable to the jury's verdicts, reasonably justifies the jury's findings. The existence of other possible inferences does not permit us to disregard the reasonable one found by the jury.

9

## II.

### *Instructional Error Claim*

Riggs requested accident (CALCRIM No. 3404) and mistake of law (CALCRIM No. 3407) jury instructions as to the assault counts. The trial court declined to give the instructions. Riggs asserts the court erred. We conclude Riggs forfeited this undeveloped argument, and, regardless, it lacks merit.

Riggs's failure to present a developed argument on this point, with no explanation or citation to authorities, forfeits the issue. (See *People v. Oates* (2004) 32 Cal.4th 1048, 1068, fn. 10 [declining to address an assertion where the appellant failed to expand on it with argument or citation to relevant authority]; *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "]; *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 ["We discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis."].)

Even if not forfeited, the argument lacks merit. "It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence—evidence sufficient for a reasonable jury to find in favor of the defendant—unless the defense is inconsistent with the defendant's theory of the case. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the

10

credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982 [cleaned up].)

CALCRIM No. 3404, the accident instruction, provides: "The defendant is not guilty of <insert crime[s]> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of <insert crime[s]> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent."[5] Essentially, "the defense of accident . . . amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime." (*People v. Anderson* (2011) 51 Cal.4th 989, 997 [cleaned up].) "A trial court's responsibility to instruct on [the defense of] accident therefore generally extends no further than the obligation to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime." (*Ibid.*)

We agree with the People that the record does not contain evidence that Riggs accidentally fired the weapon. In his opening brief, Riggs points only to "the random nature of appellant's actions, including the location of the casings," to support the theory "that appellant fired the gun accidentally or by mistake." Contrary to the assertion that Riggs's acts were "random," the record tells a different story. Riggs, appearing angry, set off to find his girlfriend or former girlfriend, Jane. Seeing her with another man, he fired at least seven shots until his gun was empty. The bullet casings were in two locations, with three casings near the motor bike, including two that struck

---

[5]     Defense counsel argued below that "the way 3404 defines criminal negligence" justified giving the instruction. As the trial court explained in denying the request for the instruction, that language does not apply to general intent crimes like assault with a semiautomatic firearm.

the engine of the motor bike.  He then hit Jane in the face and hid the gun in a bloody towel in a shed.  The court properly declined to give the accident instruction.

CALCRIM No. 3407 on mistake of law provides:  "It is not a defense to the crime[s] of <insert crime[s]> that the defendant did not know (he/she) was breaking the law or that (he/she) believed (his/her) act was lawful."  Mistake of law is not a defense to a general intent crime.  (*People v. Cole* (2007) 156 Cal.App.4th 452, 483.)  Nor is it clear why defense counsel sought this instruction or why Riggs raises it here, as it would not have benefitted him even if applicable.  The trial court properly declined to give the mistake of law instruction.

## III.

### *Ineffective Assistance of Counsel Claim*

Riggs argues he was denied effective assistance of counsel because, at the time of the jury instructions, closing arguments, and jury verdicts, his trial counsel was temporarily suspended by the California State Bar for purported noncompliance with trust account reporting requirements.  We reject this claim and conclude an attorney's temporary suspension from the bar for purported trust account reporting violations does not in itself result in the deprivation of constitutionally effective assistance of counsel.  Consequently, Riggs, who relies only on his counsel's suspension, has not established the absence of effective assistance of counsel.

Riggs's trial began in June 2024.  His attorney was suspended from the State Bar from July 2 to July 15, 2024, for the purported failure to comply with reporting requirements of the Client Trust Account Protection Program

(CTAPP).[6] On July 11, 2024, Riggs's counsel learned of his suspension and began attempting to resolve the issue with the State Bar, believing he timely completed the reporting requirement. Between the first date of his suspension and his discovery of it, certain proceedings in this case took place. On July 2 and 3, the parties and the court discussed a stipulation to the felon in possession charge and jury instructions, and the court read the jury instructions. Closing arguments took place on July 9. The next day, the jury reached its verdicts, and the court ruled on the aggravating factors and set the sentencing hearing for August 2.

On July 31, Riggs's attorney informed the court of the suspension in a motion to continue the sentencing hearing due to time spent resolving the State Bar matter. The court continued the sentencing hearing to September 6. Prior to the hearing, Riggs's counsel moved for new trial. At the September 6 hearing, the court denied that motion and sentenced Riggs.

Riggs contends his trial counsel's suspension from the State Bar denied him of his right to the assistance of counsel under California Constitution, article I, section 15 ("defendant in a criminal cause has the right . . . to have the assistance of counsel for the defendant's defense") and the cases *In re Johnson* (1992) 1 Cal.4th 689 (*Johnson*) and *Vigil, supra*, 169 Cal.App.4th 8. Based on *People v. Ngo* (1996) 14 Cal.4th 30 (*Ngo*), as well as *Johnson*, we disagree.

---

[6] We grant Riggs's unopposed request for judicial notice of defense counsel's State Bar records. (State Bar of California online attorney profile <https://apps.calbar.ca.gov/attorney/Licensee/Detail/126435> [as of March 16, 2026], archived at < https://perma.cc/4EG2-UCLD>.) (Evid. Code, §§ 459, 452, subd. (h); *People v. Vigil* (2008) 169 Cal.App.4th 8, 12, fn. 2 (*Vigil*).) We do so to clarify the dates of suspension, using those listed by the State Bar rather than in counsel's declaration in the record.

In *Ngo*, the California Supreme Court concluded "that representation of a criminal defendant by an attorney who has been involuntarily enrolled on inactive status for [mandatory continuing legal education (MCLE)] noncompliance does not, in itself, amount to the denial of counsel." (*Ngo, supra*, 14 Cal.4th at p. 38.) Like the MCLE requirement, the CTAPP "is a creature of statute and court rule." (*Id.* at p. 33.) California Rules of Court, rule 9.8.5(a)(1), directs "[t]he State Bar of California [to] establish and administer a [CTAPP]" that requires licensees to report any responsibility for client funds and certify compliance with rules and statutes related to trust accounts and funds. Like the MCLE requirement, involuntary enrollment on inactive status occurs automatically without a hearing. (*Ngo*, at pp. 33–34 ["a member who fails to satisfy the MCLE requirements of the program authorized by this court 'shall be enrolled as an inactive member' "]; rule 9.8.5(c) ["A licensee who fails to satisfy the requirements of this program must be enrolled as an inactive licensee of the State Bar."].) Inactive status could result from mere "clerical oversight." (*Ngo*, at p. 34.) And, as with MCLE compliance, "it [is] illogical to conclude that a California attorney, presumptively competent" in prior years "becomes incompetent . . . merely by virtue of . . . noncompliance" with the CTAPP requirements. (*Ngo*, at p. 37.)

The *Ngo* court distinguished the case from and clarified its prior ruling in *Johnson*. In *Johnson*, the defendant's attorney was suspended after being convicted of a felony involving moral turpitude and resigned from the bar during the representation. (*Ngo, supra*, 14 Cal.4th at p. 35.) The suspension did not "create[ ] a presumption of incompetence or deprive[ ] defendant of his right to the 'fully licensed attorney' contemplated by article I, section 15 of the California Constitution." (*Id.* at p. 35; *Johnson, supra*, 1 Cal.4th at pp. 696–702.) Rather, "the attorney's resignation from the bar with charges

14

pending resulted in the effective relinquishment of his license to practice law," and that "relinquishment denied the defendant his constitutionally guaranteed right to counsel." (*Ngo*, at p. 35; *Johnson*, at p. 702 ["while [defense counsel's] suspension alone does not establish incompetence as a matter of law, his representation of petitioner following the submission of his resignation from the State Bar with charges pending denied petitioner the representation guaranteed by article I, section 15"]; see also *Vigil, supra*, 169 Cal.App.4th at pp. 15–16 ["Here, counsel was totally absent, for state constitutional purposes, for the simple reason that [counsel], after his resignation with charges pending, was no longer an attorney eligible to practice law in the State of California."].) The *Johnson* court explained the distinction between a suspended attorney and one who tendered resignation pending disciplinary charges: "Unlike an attorney whose right to practice is suspended, there will be no further hearing to determine the attorney's competence or fitness to continue practice." (*Johnson*, at p. 702.)

Under both *Ngo* and *Johnson*, Riggs has not established he was deprived of counsel. His attorney briefly faced an administrative suspension based on purported noncompliance with a court rule; he had not resigned. Contrary to Riggs's assertion that the nature of his counsel's suspension mirrors that of *Johnson* and *Vigil*, both *Ngo* and *Johnson* establish that a resignation is qualitatively different from a suspension, especially an administrative suspension based on compliance with court rules. *Ngo* left open the possibility that noncompliance may be relevant when determining whether a defendant has received assistance of counsel. (*Ngo, supra*, 14 Cal.4th at p. 38.) But Riggs relies on the mere fact of suspension to establish a constitutional violation without presenting any additional facts related to the competence of his attorney. *Ngo* makes clear that an attorney's

suspension does not per se establish incompetence or a constitutional violation. (*Id.* at p. 36.) Therefore, Riggs has not established deprivation of effective assistance of counsel.

## DISPOSITION

We affirm the judgment.


DO, J.

WE CONCUR:

DATO, Acting P. J.

CASTILLO, J.